JAMES F. CURTIS, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 104764.   Promulgated April 25, 1944.

*John P. Ohl, Esq.*, and *Robert C. Brown, Esq.*, for the petitioner.
*James C. Maddox, Esq.*, for the respondent.

### OPINION.

HILL, *Judge*: This proceeding involves an income tax deficiency for 1936 in the amount of $93,609.21.   Petitioner, an individual, filed his 1936 tax return on the cash receipts and disbursements basis with the collector for the second New York district.   The proceeding presents the following questions:

1. Did respondent err in disallowing the deduction of certain expenses allocable to income in respect of which no tax was paid or collectible?

2. Did respondent err in disallowing the deduction of so much of the New York State income tax paid by petitioner in 1936 as was attributable to the earning of income in respect of which no Federal tax was paid or collectible?

3. Is the gain petitioner realized upon the exchange of securities of a corporation in receivership for stock of a new corporation and option warrants to purchase stock in a third corporation to be recognized and, if so, in what amount?

4. Did certain transactions carried on in a joint venture of which petitioner was a member result in a recognized gain? If so, need petitioner report as income so much of his proportionate share of such gain as is represented by the distribution to him of corporate stock?

Most of the facts are contained in a stipulation with attached exhibits, which we herewith adopt by reference. Such facts, together with others otherwise established, are summarized in conjunction with our disposition of each question. The questions are considered separately and in the order set forth above.

## Issue 1.

Petitioner was a notary public for two counties in New York. He had an arrangement with the Federal Reserve Bank of New York whereby he was engaged as a notary public to protest its commercial paper and to supervise the work of eight other notaries. The other notaries were former employees of the bank and it was its intent that their retirement allowances be supplemented by specified amounts to be derived from notarial fees. To this end petitioner allocated among the eight notaries sufficient work to enable each to earn something in excess of the amount which the bank wished him to have. The notaries periodically turned over such excess amounts to Curtis & Belknap, a law firm of which petitioner was a partner. The notarial work not let to the other notaries petitioner did himself. Through this arrangement petitioner, in 1936, received notarial fees of $18,007.35 and the other notaries together received $13,486.98, of which $2,535.02 was paid over to the law firm and added to his gross income. The $2,535.02 was not in reimbursement of expenses.

In connection with the notarial fees received by petitioner and the others, direct and indirect expenses were incurred in the respective amounts of $7,551.49 and $1,560.53, or a total of $9,112.02. In his tax return petitioner excluded from income his notarial fees, but nevertheless claimed the $9,112.02 in expenses incurred in connection with the notarial work as a deduction. Respondent disallowed the deduction as repugnant to the provisions of section 24 (a) (5) of the Revenue Act of 1936. This section provides in part as follows:

SEC. 24. ITEMS NOT DEDUCTIBLE.

(a) GENERAL RULE.—In computing net income no deduction shall in any case be allowed in respect of—

   \*       \*       \*       \*       \*       \*       \*

(5) Any amount otherwise allowable as a deduction which is allocable to one or more classes of income \* \* \* wholly exempt from the taxes imposed by this title.

Petitioner contends that section 24 (a) (5) is not applicable here for the reason that the notarial fees in question are not "wholly exempt from the taxes imposed by this title." Petitioner's argument is based

upon our decision in *James F. Curtis*, 39 B. T. A. 366, a case involving this petitioner's notarial fees for the years 1932, 1933, and 1935, and upon the differences in language used in sections 201 and 202 of the Public Salary Tax Act of 1939. In the *Curtis* case, promulgated February 9, 1939, we held that *Helvering* v. *Gerhart*, 304 U. S. 405, required the conclusion that notarial fees received by petitioner were not immune from Federal income tax. The Public Salary Tax Act of 1939 was approved on April 12, 1939, whereupon we entered an order modifying our opinion in the *Curtis* case and stating that Curtis has been relieved of tax by that act. The act provides in section 201 that income tax for any taxable year beginning prior to January 1, 1939, shall not be assessed to the extent attributable to compensation for personal services as an officer or an employee of a state or its subdivisions. Section 202 provides that such compensation, in certain circumstances, shall be exempt from taxation as to any taxable year beginning in 1938. These provisions were to apply only to the compensation of officers or employees of states which passed reciprocal legislation respecting state taxation of the compensation of Federal officers and employees. New York passed such legislation. (Title I of the act made the compensation of governmental officers and employees of states and their subdivisions and of the Federal Government reciprocally taxable after 1938.) Petitioner asserts that the decision in his prior case determines that his notarial fees are not tax exempt and that the effect of the Public Salary Tax Act of 1939 and our subsequent order in his case was merely to prevent the collection of tax on taxable income. In support thereof he directs attention to the differences in language in sections 201 and 202 of the act.

We need not pause to speculate upon considerations which might have impelled Congress to vary the terminology of the cited sections of the Public Salary Tax Act. It is enough for our purposes that the act did prevent the taxation of the compensation of state officers for all years prior to 1939 under the circumstances which here exist. *Albert J. Gould, Jr.*, 40 B. T. A. 6; *Estate of John J. Stamler*, 40 B. T. A. 56. Petitioner is not taxable upon notarial fees received in 1936. *F. Carter Johnson, Jr.*, 40 B. T. A. 20. This fact invokes section 24 (a) (5) to sustain the disallowance of expenses incident to the earning of the notarial fees, as will be presently shown.

Petitioner's contention apparently is advanced on the assumption that the phrase "income wholly exempt from the taxes" is used in section 24 (a) (5) solely to denominate a special type income specifically excludable from the general definition of "gross income" by statute or on constitutional grounds. However, the phrase is not to be so limited. Income tax laws are to be given a sensible interpretation. *Rhodes* v. *Commissioner*, 100 Fed. (2d) 966; *Margaret R. Phipps*, 42 B. T. A. 329; affd., 124 Fed. (2d) 288, and one which will effectuate the

legislative intention. *Brons Hotels, Inc.*, 34 B. T. A. 376. The language of section 24 (a) (5), including therein the phrase in question, is susceptible of only one sensible interpretation, namely, that a taxpayer is allowed no deduction for expenditures which are allocable to income that is nontaxable for whatever reason. Moreover, this interpretation is in accord with the purpose of the provision and, hence, the legislative intent as indicated by the discussion thereof in the House of Representatives, wherein it was stated:

* * * This particular amendment has reference to the question of deductions from gross income. It makes very certain the text of the bill disallowing deduction of expenses incurred in the production of non-taxable income. [Cong. Rec., vol. 78, p. 3000.]

Nor does this interpretation do violence to the wording of the section. The language of a revenue act, generally speaking, is to be given its ordinary and natural meaning. *Helvering* v. *Flaccus Oak Leather Co.*, 313 U. S. 247; *Helvering* v. *San Joaquin Fruit & Investment Co.*, 297 U. S. 496. The nub of petitioner's contention here concerns the meaning of the word "exempt." This is not a technical term. It is of common usage and is defined by Webster as meaning "free or released from some liability." Thus, when read in the usual sense, section 24 (a) (5) simply says, in short, that no deduction shall in any case be allowed in respect of any amount allocable to income free or released of taxes. It can not be gainsaid that petitioner's income from notarial fees was released from taxes. We reject petitioner's contention that section 24 (a) (5) is inapplicable.

In his brief petitioner argues a proposition alternative to that disposed of above. It is that petitioner at least should be allowed to deduct so much of the expenses incurred as are not attributable to his own fees, i. e., as are attributable to the fees received by the other notaries. No such alternative issue was presented by the pleadings and, accordingly, we are not warranted in considering it. That the proposition is positively untenable, even were it properly presented, is fully apparent on its face. A taxpayer is not allowed a deduction for expenditures made for the benefit of another. *Hal E. Roach*, 20 B. T. A. 919. Furthermore, the amounts ultimately received by all parties, with the possible exception of that unknown portion going to petitioner's law partners, constituted nontaxable income invoking the provisions of section 24 (a) (5) and it would matter not that it was nontaxable in the hands of someone other than petitioner.

We approve respondent's disallowance of expense deductions in the amount of $9,112.02.

### Issue 2.

In 1936 petitioner paid a New York State income tax of $4,138.50 based upon his total 1935 income, including that representing notarial

fees. He claimed a deduction in this amount on his 1936 Federal income tax return. Respondent disallowed the deduction to the extent of $1,046.21 on the ground that this sum was allocable to notarial fees and, hence, nondeductible under section 24 (a) (5) of the Revenue Act of 1936.

Petitioner objects to this adjustment for the same reason advanced with respect to issue 1, namely, that section 24 (a) (5) is inapplicable since notarial fees at that time did not constitute income exempt from Federal taxes. This contention is untenable, as we have pointed out in our discussion under the first issue.

As an alternative contention, petitioner asserts that the full tax deduction should be allowed since the tax was paid upon 1935 income which was taxable in its entirety under New York law. This is an irrelevant fact. Section 24 (a) (5) is concerned only with deductions allocable to income nontaxable for Federal income tax purposes. It matters not that New York treats it otherwise. Nor does it matter that the tax was paid on 1935 income, not 1936. Petitioner was on the cash basis and, so far as the state tax paid in 1936 was allocable to income free of Federal taxes, it may not be deducted on the 1936 Federal tax return, regardless of the year of accrual.

In his argument on brief petitioner resorts to figures designed to show that respondent's disallowance of $1,046.21 was based upon an erroneous method of computation. If such is a fact, it was incumbent upon petitioner to make a point of it by an alternative assignment of error supported by proof, and in this he failed. Respondent's determination carries with it a presumption of correctness. We think the presumption has not been overcome by evidence.

We approve respondent's disallowance of New York State income tax deduction in the amount of $1,046.21.

### Issue 3.

During 1935 petitioner purchased debentures of General Theatres Equipment, Inc., in the principal amount of $379,000 and certificates of deposit for such debentures in the principal amount of $321,000. The total cost of the debentures and certificates of deposit was $51,917.50 and $45,923.75, respectively. The debentures were later deposited and petitioner received therefor certificates of deposit in an equal principal amount.

General Theatres Equipment, Inc., hereinafter called the old company, was a holding company owning stocks in subsidiaries and other corporations engaged in the motion picture and theatre supply business. In April 1930 it purchased 1,600,000 shares of Fox Film Corporation's class A common stock at $30 per share. To meet the indebted-

ness thereby incurred the old company (1) issued in April 1930, $30,000,000 of its 10-year debentures under a trust indenture with the Chase National Bank as trustee and sold them to a syndicate for $27,150,000, (2) sold 617,000 shares of its own stock, (3) sold 200,000 shares of Fox Film stock to Halsey Stuart & Co., and (4) sold 240,000 shares of Fox Film stock to a syndicate which included among its members Chase National Bank's security affiliate, Chase Securities Corporation, and two directors of the old company. This syndicate resold the Fox Film stock within 10 days at a $4,000,000 profit. The debentures purchased by the petitioner were a part of the issue referred to above.

On May 6, 1930, and again on July 7, 1930, the Chase National Bank loaned the old company $2,500,000 on collateral demand notes secured by Fox Film A stock. This indebtedness had been reduced to $4,000,000 when on October 10, 1930, the bank loaned the old company an additional $6,000,000, surrendered the notes for the previous loans, and received a new note for $10,000,000 payable April 10, 1931, together with the original and additional collateral. Later the note was further secured by the deposit of additional collateral. The latter note was renewed at maturity and became payable September 28, 1931.

In February 1933 Mary N. Kaplan, an old company debenture holder, commenced a representative action against the Chase National Bank individually and as trustee of the trust indenture securing the debentures. In 1934 a Supreme Court of New York held that the extension of the $10,000,000 note violated a covenant in the trust indenture and entered a judgment directing the Chase National Bank to hold certain of the collateral deposited to secure the note for the benefit of the debenture holders. Both parties filed notices of appeal from this judgment.

Soon after the purchase of the Fox Film stock the old company became involved financially. It defaulted on interest payments on its debentures, and early in 1932 a debenture holders' committee was formed to represent the interests of the holders of debentures. The committee agreement provided for the deposit of debentures in exchange for certificates of deposit. At about the same time, as a result of a creditor's bill brought by an unsecured creditor in a Delaware court of chancery, the old company was found to be insolvent in the sense that it could not meet its obligations in the ordinary course of business. A receiver was appointed with power to conduct the business of the company.

Also in 1932 James N. Cleary, a stockholder of Fox Film Corporation, commenced a stockholder's suit in a Supreme Court of New York to recover profits made by the syndicate upon the resale of the

Fox Film stock purchased from the old company and for other relief. Among the defendants in this action were the Chase National Bank, Chase Securities Corporation, and the two directors of the old company who had participated in the syndicate. The suit was dismissed in December 1934, upon motion made at the close of plaintiff's case, on the ground that no wrong to Fox Film Corporation was shown. In its opinion the court suggested that the syndicate was liable for the profits to a proper representative of the old company by virtue of participation of its directors.

Prior to the dismissal of this action the Chase National Bank had entered into negotiations with the receiver and the debenture holders' committee for settlement of all claims against the bank and members of the syndicate. The proposed agreements contemplated, among other matters, that the bank should reduce its claim against the old company by $5,000,000; that the claims as reduced should be consented to by the receiver; that the receiver should release the Chase National Bank and the members of the syndicate from all claims which he or the old company might have against them; that the bank should participate in a plan of reorganization of the old company, provided the details of the plan were worked out in a manner satisfactory to it; and that, in this event, it should turn over to the reorganized company its claims and collateral security in exchange for common stock, give to the reorganized company an option to purchase at $15 per share approximately 325,000 shares of Fox Film stock, and lend the reorganized company money to defray reorganization expenses and provide working capital. The receiver sought the court's approval of such agreements by petition dated December 16, 1933. They were approved on November 30, 1935, the same date on which the court approved the plan of reorganization hereinafter described.

A plan of reorganization of the old company, dated August 31, 1935, was promulgated November 29, 1935, declared operative March 18, 1936, and consummated June 3, 1936. It was approved by the debenture holders' committee, whose members constituted the reorganization committee under the plan. The plan envisaged the incorporation of a new company which would succeed to the old company's assets. It provided for the adjustment of all obligations of the old company allowed in the receivership proceeding, including the debentures and its preferred and common stock. The plan incorporated the same provisions, in modified form, contained in the agreements made with the Chase National Bank. That is to say, the bank and the syndicate were to be granted a general release of claims, the bank was to surrender its claims and collateral for stock, lend the new company $2,000,000 on a note convertible at its option into debentures, and deposit not to exceed 158,313 shares of preferred and 79,157 shares of common stock

of Twentieth Century-Fox Film Corporation with a depositary, subject to the exercise of option warrants hereinafter mentioned. (Fox Film Corporation, early in the year, had been merged into Twentieth Century Pictures, Inc., and each share of Fox Film stock had been exchanged for one-half share of preferred and one-fourth share of common of Twentieth Century-Fox Film Corporation.) The basis of adjustment of obligations and stocks was as follows:

### Secured Obligation and Debentures.

For each $1,024.82 of indebtedness represented thereby _____

- (a) 10 shares of capital stock of new company.
- (b) Warrants to purchase 1¾ units* of capital stock of Twentieth Century-Fox Film Corporation at $60 per unit on or before October 1, 1936, and at $70 per unit on or before October 1, 1937.

### Notes and Accounts Payable.

For each $1,024.82 of indebtedness represented thereby _____

- (a) 7½ shares of capital stock of new company.
- (b) Warrants to purchase 1¼ units* of capital stock of Twentieth Century-Fox Film Corporation at $60 per unit on or before October 1, 1936, and at $70 per unit on or before October 1, 1937.

### Preferred Stock.

For each 10 shares _____ Warrant to purchase 1 share of capital stock of new company on or before October 1, 1937, at $12 per share.

### Common Stock.

For each 25 shares _____ Warrant to purchase 1 share of capital stock of new company on or before October 1, 1937, at $12 per share.

*Each unit consists of two shares of preferred stock and one share of common stock.

Any Twentieth Century-Fox Film stock required to fulfill the obligations under the warrants in excess of the amount deposited by the Chase National Bank was to be furnished by the new company. It did not become necessary for it to supply such stock to cover the exercise of warrants. The plan also provided that each creditor and stockholder, by assenting to the plan, thereby appointed the reorganization committee his agent to release the Chase National Bank, the members of the syndicate, and their officers and agents from all manner of claims.

Pursuant to the plan General Theatres Equipment Corporation, hereinafter called the new company, was incorporated on May 20, 1936; the assets of the old company were sold at public auction under

order of the receivership court, purchased by the reorganization committee for $4,039,367.72, and conveyed to the new company; the collateral held by the Chase National Bank for the benefit of the debenture holders under the order in the Kaplan suit was sold at public auction under a supplemental judgment, purchased by the reorganization committee for $1,963,456.34, and conveyed to the new company; Chase National Bank foreclosed the collateral which it held as security for the payment of the old company's notes, bid in the collateral for $6,944,966.21, and deposited it with the reorganization committee, which conveyed it to the new company; the receiver, the new company, and the reorganization committee, as agent for depositing debenture holders, executed general releases of claims in favor of the Chase National Bank, its security affiliate, and each of the members of the syndicate, their officers and representatives; the Kaplan and Cleary suits were terminated; a $2,000,000 loan was made by the bank to the new company; and debentures, claims, and stock were exchanged for stock of the new company, stock warrants, and warrants to purchase stock of Twentieth Century-Fox Film Corporation, as set forth in the above schedule, except that no Twentieth Century-Fox Film option warrants were issued to the Chase National Bank. Nonassenting stockholders of the old company received nothing. Nonassenting debenture holders received $148.68 in cash for each $1,000 face value of debentures.

The new company's authorized capital consisted of 800,000 shares of common stock. Of this number 274,935 were issued to debenture holders of the old company, 164,275 were issued to the Chase National Bank, 6,997 to holders of unsecured claims against the old company and, up to December 31, 1936, 79,034 were issued to the old company's stockholders upon the exercise of their warrants. Option warrants for 43,919 units of Twentieth Century-Fox Film Corporation stock were exercised. The money so received by the depositary was turned over to the Chase National Bank. The $2,000,000 borrowed from the Chase National Bank by the new company was evidenced by a note and agreement providing that the loan might be converted into debentures which, in turn, could be converted into stock. The loan was repaid in cash and no debentures ever were issued by the new company.

During 1936 petitioner, pursuant to the plan of reorganization, relinquished his certificates of deposit for $700,000 principal amount of debentures and received therefor 7,000 shares of stock in the new company having a fair market value of $133,875, and option warrants for 1,225 units of Twentieth Century-Fox Film Corporation stock having a fair market value of $41,037.50. Of the certificates of deposit so surrendered, $296,000 principal amount having a cost of $37,321.25 had been held or represented debentures which had been

held for more than one year and less than two years, and there were received with respect thereto 2,960 shares of stock of the new company having a fair market value of $56,610 and option warrants for 518 units having a fair market value of $17,353. The remaining $404,000 principal amount of certificates of deposit surrendered, having a cost of $60,520, was held or represented debentures which had been held one year or less, and there were received with respect thereto 4,040 shares having a fair market value of $77,265 and option warrants for 707 units having a fair market value of $23,684.50.

The question is whether, under these facts, gain realized by petitioner upon the exchange of his certificates of deposit for stocks in the new company and warrants to purchase stock in Twentieth Century-Fox Film Corporation is to be recognized and, if so, in what amount. Respondent held that it is and determined it to be $120,-346.26. Petitioner contends that as to the receipt of the new company stock, nonrecognition provisions of the Revenue Act of 1936 apply. The option warrants, according to petitioner's theory, were received by petitioner as consideration for his giving up rights against the Chase National Bank and in a transaction separate from and not germane to the plan of reorganization. It follows, asserts petitioner, that their value is not presently taxable as a gain, but merely goes to reduce the cost basis of his investment. We first examine the question as it bears upon the receipt of stock in the new company.

The proceeding was heard on November 18, 1943, and the original and reply briefs are devoted to the pros and cons of whether there was here a reorganization as defined by section 112 (g) (1) of the Revenue Act of 1936 and whether in any event the exchange fell within the provisions of section 112 (b) (5) of the same act. On February 25, 1944, the Revenue Act of 1943 was enacted. Section 121 thereof, entitled "Reorganization of Certain Insolvent Corporations," by subsections (a), (b), and (d), amended section 112 to include new additions and technical amendments, all of which are made retroactive by subsection (e) to include the Revenue Act of 1936. Subsequently petitioner filed a supplemental brief urging upon us the applicability of such amendments to the instant exchange. We agree that certain of the amendments govern the disposition of this issue and therefore we do not consider the question whether gain would be recognized under the former provisions of the Revenue Act of 1936.

Section 112 (l) of the Revenue Act of 1936, added by section 121 (b) of the Revenue Act of 1943, provides as follows:

(1) EXCHANGES BY SECURITY HOLDERS IN CONNECTION WITH CERTAIN CORPORATE REORGANIZATIONS.—

(1) GENERAL RULE.—No gain or loss shall be recognized upon an exchange consisting of the relinquishment or extinguishment of stock or securities in a corporation the plan of reorganization of which is approved by the court in a pro-

-ceeding described in subsection (b) (10), in consideration of the acquisition solely of stock or securities in a corporation· organized or made use of to effectuate such plan of reorganization.

(2) EXCHANGE OCCURRING IN TAXABLE YEARS BEGINNING PRIOR TO JANUARY 1, 1943.—If the exchange occurred in a taxable year of the person acquiring such stock or securities beginning prior to January 1, 1943, then, under regulations prescribed by the Commissioner with the approval of the Secretary, gain or loss shall be recognized or not recognized—

(A) to the extent that it was recognized or not recognized in the final determination of the tax of such person for such taxable year, if such tax was finally determined prior to the ninetieth day after the date of the enactment of the Revenue Act of 1943; or

(B) in cases to which subparagraph (A) is not applicable, to the extent that it would be recognized or not recognized under the latest treatment of such exchange by such person prior to December 15, 1943, in connection with his tax liability for such taxable year.

The exchange in question took place in 1936 and, obviously, there has been no final determination of petitioner's tax for that year, as this proceeding is before us for the very purpose of a determination of such tax. In these circumstances the statute directs that no gain is to be recognized upon an exchange involving the following: (1) Relinquishment by a holder of stock or securities (2) of a corporation (3) reorganized pursuant to (4) a plan of reorganization (5) approved by a court in a proceeding described in section 112 (b) (10) (6) in consideration solely of stock or securities (7) in a corporation (8) organized to effectuate the plan of reorganization (9) when the holder treated the exchange as nontaxable immediately prior to December 15, 1943. Among the proceedings described in section 112 (b) (10), added by section 121 (a) of the Revenue Act of 1943,[1] is a receivership. Disregarding the receipt of the option warrants, we think it clear that the transaction under consideration includes all the elements named above. Petitioner relinquished debentures of the old company, which was being operated under the jurisdiction of a Delaware court by virtue of an equity receivership, pursuant to a plan of reorganization approved by the court on November 20, 1935, and in consideration of this relinquishment he received stock in the new company which, according to the plan, had been incorporated for the express purpose of taking over the assets of the old company. Petitioner has consistently

---

[1] (10) GAIN OR LOSS NOT RECOGNIZED ON REORGANIZATION OF CORPORATIONS IN CERTAIN RECEIVERSHIP AND BANKRUPTCY PROCEEDINGS.—No gain or loss shall be recognized if property of a corporation (other than a railroad corporation as defined in section 77m of the National Bankruptcy Act, as amended) is transferred, in a taxable year of such corporation beginning after December 31, 1933, in pursuance of an order of the court having jurisdiction of such corporation—

(A) in a receivership, foreclosure, or similar proceeding, or

(B) in a proceeding under section 77B or Chapter X of the National Bankruptcy Act, as amended,

to another corporation organized or made use of to effectuate a plan of reorganization approved by the court in such proceeding, in exchange solely for stock or securities in such other corporation.

treated the gain as one not to be recognized to any extent. If the option warrants also were a part of the consideration for the relinquishment of the debentures, then it would be the existence of this fact alone which would prevent the operation of section 112 (1). However, the existence of this fact would require the recognition of gain realized on the exchange only to the extent of the fair market value of such warrants. Section 112 (c) (1) of the Revenue Act of 1936, as amended by section 121 (d) of the Revenue Act of 1943, provides in part:

If an exchange would be * * * within the provisions of subsection (1) of this section if it were not for the fact that property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property * * *, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of * * * the fair market value of such other property.

Since the only factor which here could prevent the exchange from coming within subsection (1) would be the conclusion that the option warrants constituted "other property" entering into the transaction, it is manifest that if subsection (1) did not apply, subsection (c) (1) would apply. Accordingly, we hold that the gain realized by petitioner on the exchange is nonrecognizable except to the extent above indicated. It thus becomes unnecessary to determine if other subsections of section 112 might call for the same conclusion, and we have refrained from considering their application.

This brings us to an examination of petitioner's contention respecting the receipt of the option warrants. If they constitute "other property" received in the exchange within the meaning of section 112 (c) (1), *supra*, then petitioner admits that such subsection requires gain to be recognized in an amount equal to the fair market value of the option warrants. However, as pointed out above, it is his position that the warrants were given in consideration of his surrender of rights against the Chase National Bank in a separate transaction not germane to the plan of reorganization and that their receipt merely reduces the cost basis of his investment. We have scrutinized the facts in all their complexness and have no trouble concluding that they do not support petitioner's position. It is true that petitioner, as well as other creditors and stockholders of the old company, did appoint the reorganization committee their agent to release the Chase National Bank from all claims whatever; that the bank was so released; and that the bank did in fact put up the Twentieth Century-Fox Film Corporation stock necessary to cover the exercise of the option warrants. However, the purpose behind petitioner's release and the bank's application of its Twentieth Century-Fox Film stock and the relationship of such acts, one to another, if any, can be ascertained properly only by viewing them in the setting of the whole picture. So examined, it appears beyond cavil that the release and the bank's appli-

cation of stock did not constitute a distinct *quid pro quo*, but, contrariwise, comprised only steps in an integrated plan envisaging much broader consequences. The plan of reorganization, so intricate as to require 48 pages for complete expression, was designed to resolve all matters in any way emanating from the financing of the old company as well as to provide for its obligations and stock. It provided that all participants in the reorganization should release from liability of every kind not only the Chase National Bank, but the numerous concerns and individuals who had had a part in the financing. Creditors and stockholders gave up their "rights" against these parties, whatever those rights might have been, simply by participating in the plan. Moreover, to participate in the plan they also had to relinquish their securities or stock. Debenture holders, of whom petitioner was one, by so participating received stock in the new company *and* warrants to purchase a specified amount of stock in Twentieth Century-Fox Film Corporation for a named sum. It is evident that petitioner could not have chosen to refuse the release and to merely relinquish the debentures for stock of the new company. Nor could he have given a release merely for option warrants to purchase Twentieth Century-Fox Film stock while electing to keep his debentures. Likewise the Chase National Bank, if it participated in the plan at all, was obliged to do a number of things, of which the placement of its Twentieth Century-Fox Film stock in escrow to cover the exercise of the option warrants was only one. For example, it was also contemplated that it should reduce its claim against the old company by $5,000,000, lend the new company $2,000,000, relinquish the securities, and surrender the collateral which had secured them. Thus, with respect to all performances required by this integrated plan, it was a matter of the happening of all or none, thus negativing petitioner's contention that warrants were given for rights in a transaction apart from the plan of reorganization. Other circumstances, too, rebut his contention, but we deem it unnecessary to further prolong this opinion by pointing them out.

We are satisfied and hold that the option warrants to purchase stock in Twentieth Century-Fox Film Corporation must be termed "other property" within the meaning of section 112 (c) (1). Since the stock of the new company had a market value in excess of the cost of certificates of deposit for debentures to petitioner, the full fair market value of the warrants represents the recognized gain on the transaction. This value is stipulated to be $41,037.50. However, option warrants having a fair market value of $17,353 were received in exchange for certificates of deposit for debentures which had been held, or represented debentures which had been held, for more than one year and less than two years. The certificates of deposit constituted capital assets in the hands of petitioner, an

individual. Accordingly, under section 117 (a) of the Revenue Act of 1936 only 80 percent of this portion of this recognized gain is to be taken into account in computing net income. Hence, the amount to be added to petitioner's 1936 income by reason of our holding on this issue is $37,566.90, and respondent erred in so far as he added a greater amount.

*Issue 4.*

Petitioner's brother, Harry A. Curtis, had an ordinary margin account with a brokerage firm. The brothers agreed that petitioner should purchase debentures or certificates of deposit for debentures in the old company through this brokerage account, with profits or losses resulting from the purchases to be divided equally between the two. Petitioner lent solely his services and Harry solely his credit to the joint venture. From November 1935 through March 1936 certificates of deposit for debentures in the principal amount of $500,000 were acquired. Certificates of deposit for $43,000 principal amount of debentures were sold during April and June of 1936 at a profit of $4,736.77 and the parties are agreed that one-half thereof, or $2,368.38, is taxable gain to the petitioner.

The remaining certificates of deposit, which cost $98,293.29, were exchanged for 4,570 shares of stock in the new company having a fair market value of $87,401.25 and option warrants for 799.75 units of Twentieth Century-Fox Film Corporation stock having a fair market value of $26,791.63. An option warrant for .25 unit was purchased for $11.88.

During 1936 all shares in the new company so received were sold for $106,467.69. On September 12, 1936, the option warrants were exercised and, upon the payment of $48,000, the brothers received 1,600 shares of preferred and 800 shares of common stock in Twentieth Century-Fox Film Corporation. Of the cost of the stock, 71.9 percent is to be allocated to the preferred and 28.1 percent to the common. Within the year 1,000 shares of preferred and 750 shares of common were sold for $38,146.70 and $22,852.03, respectively.

The brothers received $600 in dividends and paid out $1,228.27 in interest during 1936 in connection with their joint venture.

No distribution was made to petitioner on account of the foregoing transactions until the joint venture was terminated. Petitioner then received as his share of the profits the remaining Twentieth Century-Fox Film stock, being 600 shares of preferred and 50 shares of common, then having the respective values of $22,433.94 and $1,465, plus $207.06 cash.

Petitioner reported as taxable gain arising from the joint transactions stated above only the $207.06 cash received and, as indicated,

now admits to an additional taxable gain of $2,368.28. Respondent determined the gain to be $24,584.35. What is the amount which petitioner should have reported as income from the joint venture?

Petitioner asserts that he received no taxable income from the distribution of the Twentieth Century-Fox Film stock to him upon the termination of the joint venture, and cites *Annie Laurie Crawford et al., Executors*, 39 B. T. A. 521, and *Robert W. Wilmot*, 44 B. T. A. 1155, to support this contention. But no one contends that he did. The question is whether petitioner's share of gains realized through the several sales and exchanges of the jointly held securities are taxable to him in 1936. The *Crawford* and *Wilmot* decisions most assuredly do not suggest that partners may postpone the imposition of tax on partnership profits by the simple expedient of distributing such profits in the form of property other than cash. Hence, they do not assist petitioner in avoiding tax on his portion of the gains arising from the joint transactions.

When business is carried on as a partnership or a joint venture (which from the standpoint of the Federal tax laws amounts to the same thing, see section 1001 of the Revenue Act of 1936), as in other cases, the question whether taxable profits have been made is determined annually as a result of the operations of the year. *Heiner* v. *Mellon*, 304 U. S. 271. In 1936 petitioner and his brother made the following sales or exchanges of jointly held securities: (1) Sold certificates of deposit for $43,000 principal amount of the old company's debentures, (2) exchanged certificates of deposit in the principal amount of $457,000 for 4,570 shares of stock in the new company and option warrants to purchase 799.75 units of Twentieth Century-Fox Film stock, (3) sold the stock in the new company, (4) sold 1,000 shares of Twentieth Century-Fox Film's preferred stock, and (5) sold 750 shares of Twentieth Century-Fox Film's common stock. The profits, if any, arising from these transactions constitute income of the joint venture for the taxable year 1936 and, to the extent recognized under section 112, must be included in computing the income of each member. Secs. 182 and 183, Revenue Act of 1936. Petitioner is liable for income tax on his proportionate share of such income, regardless of the fact or manner of its distribution. *Heiner* v. *Mellon, supra; Earle* v. *Commissioner*, 38 Fed. (2d) 965; *Bourne* v. *Commissioner*, 62 Fed. (2d) 648. It thus becomes necessary to examine each of the sales or exchanges enumerated above to determine if gain arose and, if so, in what amount. We will refer to them by number.

The parties have stipulated that petitioner realized a taxable gain of $2,368.38 from sale (1).

Exchange (2) involves the same exchange as was the subject of our discussions under issue 3. For the reasons there assigned, we con-

clude that this transaction is governed by the provisions of section 112 (c) (1) of the Revenue Act of 1936, as amended by section 121 (d) of the Revenue Act of 1943. The cost of the certificates of deposit relinquished was $98,293.29 and the stock of the new company and option warrants for stock in Twentieth Century-Fox Film received therefor bore the respective market values of $87,401.25 and $26,791.63, a total of $114,192.88. Thus, the gain from this exchange to be recognized under section 112 (c) (1) is $15,899.59. *Leo Propper*, 33 B. T. A. 261; reversed on other grounds, 89 Fed. (2d) 617. Petitioner's share of the gain is $7,949.79.

To ascertain whether a gain was made upon sale (3), it is first necessary to determine the basis of the 4,570 shares of the new company's stock in the hands of petitioner and his brother. This requires the application of section 113 (a) (6) of the Revenue Act of 1936, which states that the basis of property acquired in an exchange described in section 112 (c) shall be the same as in the case of the property exchanged, decreased in the amount of any money received and increased in the amount of gain or decreased in the amount of loss that was recognized. Here the property exchanged, the certificates of deposit, had a basis of $98,293.29, their cost. The brothers received no money, but a gain of $15,899.59 was recognized. Therefore, the basis of the stock of the new company and the option warrants is $98,293.29, less zero, plus $15,899.59, or $114,192.88. Section 113 (a) (6) further provides for an allocation of the basis between property received without recognition of gain or loss (the stock) and other property received in the exchange (the option warrants). It is stated that there shall be assigned to the other property its fair market value which, in this instance, was $26,791.63. Hence, the basis of the stock was $87,401.25. It was sold for $106,467.69, a profit of $19,066.44, of which petitioner's share is $9,533.22.

Petitioner and his brother purchased an option warrant for .25 unit of stock in the Twentieth Century-Fox Film Corporation for $11.88, to give them ownership of warrants for an even 800 units. They exercised their options and for $48,000 purchased 1,600 shares of preferred and 800 shares of common stock in Twentieth Century-Fox. The basis of all this stock was the basis of the warrants received in the exchange, $26,791.63, plus the cost of the warrant for .25 unit, $11.88, plus the cost of conversion, $48,000, or $74,803.51. Of this sum 71.9 percent is allocable to the 1,600 shares of preferred and 28.1 percent to the 800 shares of common stock, being the respective amounts of $53,783.72 and $21,019.79. By sale (4) the brothers sold 1,000 shares of preferred stock for $38,146.70, thus realizing a profit of $4,531.87, of which petitioner's share is $2,265.93. By sale (5) they sold 750 shares of the common stock for $22,852.03, thus realizing a profit of $3,145.99, of

which petitioner's share was $1,573. The sum of these gains plus petitioner's half of the dividends received and less his half of the interest paid equals $23,376.19. We hold this to be the amount of petitioner's distributive share of income from the joint venture which is taxable to him for the taxable year in question.

The proceeding will be disposed of in accordance with the foregoing opinion.

*Decision will be entered under Rule 50.*