Standard Paving Company, a Dissolved Corporation, Appearing Through I. V. Gray, Chas. Gray, J. L. Gray, J. B. Gray and H. C. Gray, Its Directors at the Time of Dissolution and Its Liquidating Trustees, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Standard Paving Company, a Corporation, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 13006, 13013. Promulgated September 29, 1949.

*Geo. E. H. Goodner, Esq.*, and *Roger S. Randolph, Esq.*, for the petitioners.

*E. G. Sievers, Esq.*, and *Allen T. Akin, Esq.*, for the respondent.

426

428

430

432

OPINION.

DISNEY, *Judge*: (1) Oklahoma Standard and Delaware Standard were on an accrual basis of accounting and reported income from long term construction contracts on the completed contract basis. The contracts entered into by Oklahoma Standard for the Gruber, Dalhart, and Memorial Boulevard projects [1] were incomplete at the close of September 20, 1942, when Delaware Standard succeeded Oklahoma Standard in a transaction the parties agree was a nontaxable reorganization under the provisions of section 112 of the Internal Revenue Code. Oklahoma Standard did not in its final return for the period ended September 20, 1942, report any income from the Gruber and Dalhart joint ventures, but included therein an amount for income derived from the Memorial Boulevard Project based upon the theory, thereafter found to be erroneous, that the contract had been completed. The income from the Gruber and Dalhart joint ventures was reported by Delaware Standard in its return for the fiscal year ended September 30, 1943, nothing being reported as income from the Memorial Boulevard contract. In his determination of the deficiencies the respondent allocated to Oklahoma Standard a portion of the income from the Gruber and Dalhart ventures and made no adjustments in income derived from the other contract.

[1] The contract for access roads at the Cookson Hills Cantonment is treated by the parties as part of the Gruber Joint Venture for purposes of taxation.

The first point for decision under the issue is whether Oklahoma Standard derived any taxable income from the contracts. The petitioners contend that without the nontaxable reorganization Oklahoma Standard would not have realized any taxable income under the three contracts at the close of September 20, 1942, and that the transaction occurring at that time did not change the result. Respondent's position, in general, is that the completed contract method of accounting does not clearly reflect income of a corporation from contracts in the course of completion at the time of its dissolution, as here, in a tax-free reorganization, and that the nontaxable reorganization does not affect the taxable income of Oklahoma Standard, and that, under sections 41 and 42 of the Internal Revenue Code, he had authority to determine its income under the circumstances existing on September 20, 1942, when that company closed business.

Petitioners assert that as all of the assets of Oklahoma Standard, including its interest in the joint ventures and the Memorial Boulevard contract, were transferred to Delaware Standard in the reorganization, and respondent admitted in his answer to the amended petition in Docket No. 13013 that neither corporation realized any taxable gain nor sustained loss in the reorganization, the admission constitutes a concession that Oklahoma Standard realized no income at the close of September 20, 1942, from the joint ventures or the Memorial Boulevard contract. No authority is cited by the petitioners to support their contention other than section 29.22 (a)–20 of Regulations 111, which is to the effect that a corporation realizes no gain or loss in the mere distribution of its assets in kind in complete liquidation.

Petitioners' argument fails to recognize the statutory distinction between income earned by ordinary operations and gain in a disposition of property in a transaction that terminated the existence of the corporation. The respondent is not attempting to assert a tax against Oklahoma Standard on gain realized from a transfer of assets in the tax-free reorganization. All he seeks to do, briefly stated, is to assess a tax against Oklahoma Standard for income earned by it under the contracts prior to the reorganization. Gain, the excess of the amount realized in a sale or other disposition of property over the allowable basis, is not involved in the question.

Similar facts were present in *Jud Plumbing & Heating, Inc.*, 5 T. C. 127; affd., 153 Fed. (2d) 681. The corporation involved therein was on an accrual and the completed contract bases of accounting and at the time of its liquidation had a number of long term contracts in the course of completion. Upon the dissolution of the corporation on August 31, 1941, all of its assets were transferred to the owner of substantially all of the corporation's stock, who assumed the liabilities and agreed to complete the contracts. Thereafter in 1941 the work

was completed by the former stockholder. The corporation did not include in its final return any income arising from the incompleted contracts so transferred. The income from the contracts was included in the return of the individual former stockholder for 1941. The Commissioner, as here, allocated a portion of the income derived from four of the contracts to the corporation on the theory that such action was necessary to clearly reflect its income, citing section 41 of the Internal Revenue code.[2] The other contracts were ignored by him.

The petitioner contended that, under the corporation's method of accounting and reporting income on the completed contract basis, the corporation derived no income from the contracts prior to dissolution and that the Commissioner was without authority to change the corporation's accounting method because of its liquidation.

In sustaining the action of the Commissioner, we pointed out that a consistent method of reporting income by the completed contract method clearly reflects income "if the taxpayer continues in existence" and that the adjustments made by the Commissioner were authorized by section 41, *supra*, and consistent with the rule that "income is taxable to him who earns it." The Circuit Court of Appeals, in affirming this Court, remarked that where the voluntary act of a corporation prevents the completion of a long term contract, it is not in a position to insist that its income is free of tax or that its tax liability on such contracts can be measured only at time of completion, and that the dissolution of a corporation during the course of completing a long term contract is a detail not covered by the completed contract method of accounting.

It seems apparent from the facts that Oklahoma Standard had earned income from the contracts prior to the reorganization. At that time, when the Gruber Project was about 91 per cent complete, the joint venture had received, in partial payments for work performed, about $2,210,000, against costs to that date of about $1,955,-000, and about $128,000 was being withheld for retainage and liquidated damages. The Roads Project was completed prior to the reorganization, although notice of final acceptance was not given by the United States until December 3, 1942. Except for "clean up" operations, the work on the Gruber Project was completed prior to the reorganization, according to an inspection made by the area engineer, and final acceptance, given on May 10, 1943, was made as of dates prior to the reorganization. However, the respondent does not contend

---

[2] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *

that the Gruber Project was completed on September 20, 1942, to the extent of more than 91.34 per cent. The amounts received and earned to September 20, 1942, on the Dalhart Project exceeded costs by about $28,000, and the percentage of completion was about 76.66. Likewise, receipts from and retainage in the Memorial Boulevard contract, on September 20, 1942, were about $13,000 in excess of costs to that date. If the theory of petitioners were given its full effect, no income would be derived by a transferor corporation, as here, even though on the crucial date all of the work specified in the contract had been performed and nothing remained except final acceptance and receipt of remaining contract payments. Furthermore, it would enable a parent corporation to evade tax by absorbing in a nontaxable reorganization a subsidiary about to realize income from incompleted contracts. Clear legislative sanction would be required to create such a distortion of income.

*Commissioner* v. *Sansome*, 60 Fed. (2d) 933, cited by petitioners, involved tax to a stockholder on earnings of a corporation upon the distribution thereof on dissolution of its successor, not a tax to the predecessor corporation on the income when earned by it. *Commissioner* v. *Phipps*, 167 Fed. (2d) 117, concerned the treatment, in determining earnings available for distribution to stockholders, of a surplus and deficits acquired by a corporation in a tax-free reorganization, a question similar to the one in the *Sansome* case. The Supreme Court, in reversing the decision, concluded that "the *Sansome* rule is grounded not on a theory of continuity of the corporate enterprise but on the necessity to prevent tax evasion." *Commissioner* v. *Phipps*, 336 U. S. 410. Such conclusion is opposed to the theory of petitioners that a tax-free reorganization prevented respondent from changing the method of reporting income on contracts incompleted at the time of its dissolution. Sections 113 (a) (15), 44 (d), and 117 (h) of the Internal Revenue Code, relating to the basis for property, profit on installment sales, and the holding period for capital assets, involved in a nontaxable reorganization, are in keeping with the general rule that such transactions merely defer gains otherwise taxable, because of a continuity of interest. They relate to situations growing out of the reorganization itself and not, as here, to matters producing income before a plan of reorganization was prepared and carried out.

One of the grounds upon which petitioner seeks to distinguish the *Jud* case is that it did not involve a nontaxable reorganization. We do not think that distinction in the facts is sufficient reason to decline to follow it here. Oklahoma Standard, as in the case of the corporation in the *Jud* case, did dissolve and such action terminated the method theretofore consistently followed of reporting income on long

term contracts, leaving in its hands income in the process of accrual on which no tax had been paid. Had Delaware Standard, the parent corporation, elected to dissolve its subsidiary without a tax-free reorganization, the earnings from incompleted contracts would fall squarely within the rule in the *Jud* case. Its choice of methods to put Oklahoma Standard to death may not be used to defeat a tax on income earned during the last taxable period of the corporation's life. Any method of accounting must clearly reflect income. We find nothing in the reorganization provisions of the statute deferring to a future date tax on income earned under an accrual method of accounting. The reorganization prevented Oklahoma Standard from continuing its completed contract method of reporting income on long term contracts. Obviously, another method was necessary clearly to reflect its income. A change to a strict accrual method was made by the respondent, action having statutory authority in section 41, *supra*.

That section has been variously construed as granting a broad power to the Commissioner. Thus, in *Rouss* v. *Bowers*, 30 Fed. (2d) 628, affirming 4 B. T. A. 516, a case in some respects similar in principle to this, a sole proprietor, on an accrual basis, took inventories and determined profits as of June 30 and December 31 of each year. On May 13, 1918, he organized a corporation to which the business was transferred. The books were not closed on that date. The corporation reported the income of the business for the entire calendar year, while the sole proprietor reported none of it. The Commissioner was upheld in assessing, under the predecessor of section 41, to the proprietor on the basis of the business income in proportion to the number of days in the year, before the transfer, in the absence of showing of the true profits. In *C. L. Carver*, 10 T. C. 171; affd., 173 Fed. (2d) 29, we approved the Commissioner's action under section 41 in recomputing petitioner's income on the accrual basis, instead of the cash basis used by the petitioner in computing net income, though he had changed his books to the accrual basis. We quoted *William Hardy, Inc.* v. *Commissioner*, 82 Fed. (2d) 249: "In deciding what method is necessary clearly to reflect a taxpayer's income, the commissioner is given a breadth of discretion which, though not unlimited, will be reviewed here only when abuse of it is clearly shown," citing *Brown* v. *Helvering*, 291 U. S. 193; *Lucas* v. *American Code Co.*, 280 U. S. 445. In *Rosa Orino*, 34 B. T. A. 726, the petitioner, engaged in the contracting business, kept books on an accrual basis, and set up cash received on Government contracts, and amounts of earned percentages retained by the Government pending contract completion. The Commissioner determined under section 41 that this method reflected income, and in the absence of contrary showing we affirmed, irrespective of whether

the contracts were long term, and despite the fact that in a later year it developed, due to loss from fire, that less than contract price was received, and despite the general fact that work on the contracts sometimes has to be redone.

The exercise of authority by the Commissioner under section 41 in the instant case seems well within the range indicated by the above cases.

Moreover, it seems plain that a situation such as arises here, from nontaxable reorganization of a corporation on a completed contract basis, is one calling for application of section 41. The gist of that section is proper reflection of income. The petitioner, in effect, urges that the reorganization, being nontaxable, left the new corporation precisely in the shoes of the old, so that it can report the income on the long term basis. But this view would deny the new corporation a right to select its own method of accounting. What if it chose to follow the percentage of completion method? It would have that right, subject, at most, to permission from the Commissioner—if the new method properly reflected income. But if a new method of accounting such as percentage of completion omitted from income some percentage completed before the reorganization, it is clear that the Commissioner could act under section 41. Yet here he is doing nothing more, for it is obvious that he considers his action to be within the statute. If the Commissioner can refuse the new corporation a change of accounting method in order to assure proper reflection of income, we think he can under section 41 prescribe that income shall fall upon the transferor and transferee so that income will not be distorted. That is the action he has taken.

Another ground urged by the petitioners against taxing to Oklahoma Standard any amount as profit earned under the contracts is that for various reasons, including retainage, liquidated damages, change orders, and renegotiation, it was impracticable at the close of September 20, 1942, to endeavor to make any determination of ultimate profit.

The completed contract method does not require completion of more than all important particulars called for by a contract. *Ehret-Day Co.*, 2 T. C. 25, 34; *Mesta Machine Co.*, 12 B. T. A. 523. Under all the circumstances before us here, an attempt, under section 41 of the Internal Revenue Code, to allocate earned income between successive corporations seems to require no essentially different treatment. *Bent v. Commissioner*, 56 Fed. (2d) 99, cited by the petitioners, involved the right to change from a completed contract method consistently followed by a going partnership of which the taxpayer there was a member, to an annual accrual basis, and not, as here, the dissolution of the contractor during the course of completion of a long term contract.

The remarks of the court concerning the indefiniteness of the financial outcome of long term contracts were made to illustrate that receipts thereunder do not necessarily reflect profit.

The corporation involved in *Guy M. Shelley*, 2 T. C. 62, kept its books on an accrual basis, using the completed contract method for reporting income on long term contracts. After completing a long term contract, except for a test run and receiving the final payment, and filing a certificate of dissolution, the corporation distributed income from the contract directly to its stockholders. We held that the income from the long term contract was taxable to the corporation. Such conclusion had the effect of placing the corporation on a strict accrual basis.

Involved in the issue, to the extent that it applies to the Gruber and Dalhart projects, is the question of whether the fact that the joint ventures were entered into to perform the contracts produces a different result. Petitioners argue that the joint ventures continued without change until 1943, when the contracts were renegotiated; that the reorganization did no more than effect a transfer of the interest of Oklahoma Standard in the joint ventures to Delaware Standard; that the joint ventures were on the calendar year basis of accounting and, accordingly, none of the joint ventures realized any income prior to the close of 1942.

Respondent's position is that, as the code treats joint ventures as partnerships for Federal taxation, the dissolution of Oklahoma Standard terminated the joint ventures on September 20, 1942. Petitioners argue that the code is silent on the dissolution of a joint venture or what occurs when a coadventurer transfers his interest. They say that the power to legislate on such matters is vested in the states and that in Oklahoma the transfer of an interest in a joint venture does not dissolve the enterprise and a corporation may not be a member of a partnership. Thus, petitioners say, in effect, that the code provision classifying joint ventures as partnerships for Federal taxation purposes is inapplicable because local law governs and, in Oklahoma, Oklahoma Standard could not be a partner.

"* * * State law may control only when the operation of the Federal taxing act, by express language or necessary implication, makes its operation dependent upon state law. * * * The state law creates legal interests, but the Federal statute determines when and how they shall be taxed." *Burnet* v. *Harmel*, 287 U. S. 103.

Section 3797 (a) (2) of the Internal Revenue Code defines the term "partnership" as including a joint venture and the term "partner" as including a member of a joint venture. Subsection (a) (1) defines the term "person" as including a corporation, unless otherwise distinctly expressed.

The Senate Committee on Finance in Senate Report No. 665, said that the purpose of including the counterpart of section 3797 (a) (2) in the 1932 Act was to place joint ventures in the category of partnerships "and the members of such syndicates, pools, etc., in the category of partners." This Court has said that joint ventures and partnerships "from the standpoint of the Federal tax laws amounts to the same thing." *James F. Curtis*, 3 T. C. 648, 662. Under the circumstances, it is obvious that the question here is not, as argued by petitioners, dependent upon state law, but is controlled by the applicable Federal statute. *Lucas* v. *Earl*, 281 U. S. 111; *Helvering* v. *Clifford*, 309 U. S. 331; *Burk-Waggoner Oil Ass'n.* v. *Hopkins*, 269 U. S. 110; *Commissioner* v. *Tower*, 327 U. S. 280.

Moreover, we find upon examination of local law that, although in Oklahoma a corporation may not become a member of a general partnership, *Municipal Paving Co.* v. *Herring*, 50 Okla. 470; 150 Pac. 1067; *Kasiske* v. *Baker*, 146 Fed. (2d) 113, "The law of partnership applies in settlement of questions arising among the parties, and in relation to third parties" with respect to joint ventures. *O. K. Boiler & Welding Co.* v. *Minnetonka Lumber Co.*, 103 Okla. 226; 229 Pac. 1045; *Twyford* v. *Sonken-Galamba Corporation*, 177 Okla. 486; 60 Pac. (2d) 1050; *Taylor* v. *Brindley*, 164 Fed. (2d) 235. In Oklahoma a general partnership is dissolved upon the transfer of a partnership interest to a nonpartner. Title 54, sec. 45, Oklahoma Stat. 1941, sec. 11652, Oklahoma Stat. 1931.

By placing Oklahoma Standard in the category of a partner, as required by the Federal statute for purposes of taxation, we find that the transfer of its interest in the joint ventures to Delaware Standard caused the dissolution thereof and required an accounting for profits distributable to the retiring member during the last taxable period of its membership. *Guaranty Trust Co.* v. *Commissioner*, 303 U. S. 493; *Darcy* v. *Commissioner*, 66 Fed. (2d) 581; *Louis Karsch*, 8 T. C. 1327. Such distributable income was not in any sense a return of capital for use in computation of gain or loss, deferred or otherwise, for no tax had been paid on it.

The transfer by Oklahoma Standard of all of its assets to Delaware Standard included its interest in the joint ventures and the construction contracts being carried out by them. But the transferor had earned a right to a portion of the profits of the joint ventures prior to the dissolution and such distributable income may not be assigned without tax liability. *Helvering* v. *Horst*, 311 U. S. 112, is an example of that well establish rule.

The members of the Gruber Joint Venture agreed to close the books of the venture as soon as possible after completing the Gruber Project. However, the venture made no formal election in the matter and filed no return, even though the Roads Project was completed

prior to the reorganization, and there was at least a preliminary acceptance of the work on the Gruber Project. Concerning the Dalhart Joint Venture, there was a division of the work among the coadventurers, with a separate accounting by each. The plan adopted did not require any of the coadventurers to await the outcome of the whole project before computing its profit or loss. If the joint ventures were on the completed contract method of accounting the result would be no different than the status of Oklahoma Standard with respect to the Memorial Boulevard contract, for the dissolution of the joint ventures would have required the respondent to place them on a strict accrual basis in order clearly to reflect income. We find nothing in the fact that the Gruber and Dalhart projects were being carried out by joint ventures to require a conclusion different from that reached as to taxable income of Oklahoma Standard from the Memorial Boulevard contract.

The parties differ on the method to be used in determining the amount of income accruable to Oklahoma Standard under the joint ventures and Memorial Boulevard contract as of the close of September 20, 1942. Their respective methods are:

|  | Gruber | Dalhart | Memorial Boulevard |
|---|---|---|---|
| Petitioner: |  |  |  |
| Received and earned | $736, 615. 32 | $465, 198. 47 | $81, 249. 37 |
| Costs | 651, 862. 18 | 487, 614. 45 | 77, 576. 35 |
| Income | 84, 753. 14 | *(22, 415. 98) | 3, 673. 02 |
| Respondent: |  |  |  |
| Net profit | 228, 813. 35 | 117, 783. 97 | 12, 700. 72 |
| Percentage completion | 91. 34 | 76. 66 | 98. 67 |
| Net profit Sept. 20, 1942 | 208, 998. 11 | 90, 293. 19 | 12, 531. 80 |

*Loss.

In determining the deficiencies respondent included in gross income of Oklahoma Standard the amount of $228,842.23 [a] as income from the Gruber Joint Venture and $95,255.07 from the Dalhart Joint Venture, based upon the theory that the contracts were fully and 95 per cent completed, respectively. Oklahoma Standard included $12,700.72 in its income as profit from the Memorial Boulevard contract, and respondent made no adjustments of the figure. The lesser amounts now being asserted by respondent as allocable to Oklahoma Standard are based upon evidence produced at the hearing on the degree of completion of the construction contracts on September 20, 1942.

Petitioners first urge upon brief that the admission of respondent to the effect that the evidence establishes a lesser degree of completion

---

[a] Respondent now agrees that $228,813.35 is the correct net profit realized from the contract.

of the contracts than the percentages determined by him when asserting the deficiencies, amounts to a confession of error and requires us to find and hold that there is no deficiency. They regard his present position as an abandonment of the deficiencies here in question and the assertion of a new deficiency, for which there is no provision in the code. Disagreement with them on the point is then said to require a ruling of the Court that respondent deprived himself of the presumption of correctness of his deficiencies, and that the petitioners were relieved of the burden of proof. No authority is cited in support of the contentions.

There was no abandonment by respondent before or during the hearing of his original position and, at the hearing, each party submitted testimony on the general issue. The view of respondent upon brief is, in effect, no more than that the evidence in the record establishes that the degree of completion of the contracts was less than the percentages determined by him and reported by Oklahoma Standard in the case of the Memorial Boulevard contract. At most, it is an admission on his part, irrespective of the burden of proof, that the evidence is against him to a specified degree. Such a conclusion, reached from his estimate of the weight of the evidence, can not be stretched to the lengths urged by petitioners. If it could be, respondent would be at all times compelled to urge affirmation of his entire deficiency or lose everything under an admission, after the evidence was in, that an error of judgment, however small, had been committed.

Petitioners' contention, as we understand it, would embrace an unrelated issue—the Oklahoma state income tax deduction question—and make it unnecessary for us to decide the issue on whether Oklahoma Standard was wrong in reporting income from the Memorial Boulevard contract, as to which respondent made no determination other than to treat the return as correct in that respect. In spite of the views of petitioners, they ask us to find as a fact that about 76.66, 91.34, and 98.67 per cent of the Dalhart, Gruber, and Memorial Boulevard contract prices, respectively, had been earned at the close of September 20, 1942, and admit income from the Gruber and Memorial Boulevard contracts prior to September 20, 1942, if an allocation is required and their method of computing the income is accepted by us.

We find no logical reason to conclude that the present position of the respondent, based upon the evidence of record, as distinguished from facts forming a basis for his original determination, shifted the burden of proof. There has been no abandonment or repudiation of the deficiencies, coupled with arbitrariness in the original determination, as in *Tex-Penn Oil Co.* v. *Commissioner*, 83 Fed. (2d) 518. The duty of this Court "is to weigh the evidence and declare the result as to matters properly before it," *Helvering* v. *Kehoe*, 309 U. S. 277,

and in doing so we must consider the entire record, irrespective of which party in the proceeding had the burden of proof.

It will have been observed that petitioners' method of computing profit under the contracts involves only receipts and costs to September 20, 1942, without taking into account any subsequent events, and respondent's method, simply stated, allocates the final profit, about which there is no controversy, on the basis of percentage of completion on that date. Neither party regards their or his method as mathematically accurate. Petitioners point out that their method takes into account only amounts to be considered in an accrual method of accounting, thereby eliminating amounts received with respect to estimates for periods ended after September 20, 1942, also retainage and liquidated damages, which, it is urged, were not taxable income on the crucial date under the rule of *Cleveland Trinidad Paving Co. (Ohio)*, 20 B. T. A. 772; affd., 62 Fed. (2d) 85, and similar cases. Respondent opposes petitioners' method on the ground that it includes costs for unused material on hand on September 20, 1942, as to which there is no evidence.

Petitioners use the figure $487,614.45 as cost to September 20, 1942, in arriving at a loss of $22,415.98 as of that date on the Dalhart Project. Such cost is shown in a statement allegedly prepared from the books of the joint venture. The same statement discloses total costs of $965,063.16 to complete the contract. The testimony is that the costs incurred by Oklahoma Standard to September 20, 1942, were $442,251.98 and the return filed by Delaware Standard shows total costs of $515,760.20. There is indication that the figure of $487,614.45 includes costs of subcontractors. In making our findings on the costs, we have followed the testimony and return. By correcting petitioners' computation on brief, we find profit of about $23,000, instead of a loss.

In urging us to disregard retainage, petitioners, in effect, treat the question as though our problem were simply whether the amounts were accruable during the course of completion of long term contracts by a single corporation. More is involved. The work was undertaken by Oklahoma Standard and completed by Delaware Standard. The amounts retained for work done by the former were paid to the latter without effort on its part, and there would be a distortion of income, under the facts here, unless it is taxed to the corporation that earned it.

Oklahoma Standard accrued such retainage under the Memorial Boulevard contract when reporting income therefrom, even though all of it was not paid until December 1943. Such action discloses its judgment on the ultimate right to receive the amount.

In the contracts for the Gruber and Dalhart projects provisions were inserted under the terms of which retainage could be paid prior to completion of the work. About $49,000 was paid to the Gruber Joint

Venture in June 1942, and the additional amount of about $109,000 before the close of that year. An amount for retainage in excess of the retainage outstanding on September 20, 1942, was paid to the Dalhart joint venture about the close of the year.

In the *Jud* case, the respondent determined the state of completion of the contracts on the basis of costs to the date of transfer and total costs and applied the ratio between them to total profits, to compute the profit to the date of transfer. Payments there, as here, were made to the contractor on the basis of estimates submitted during the course of completion of the contracts, and were less "retainage." The method was regarded by this court as "probably the best method of determining the correct allocation of the profits from each contract" under the circumstances and was not disturbed in the absence of proof of a better method.

The method advanced by petitioners ignores the final profit, which, in the final analysis, is the amount to be taxed. The Memorial Boulevard contract was practically completed on September 20, 1942, yet only 29 per cent of the profit thereunder is included in the income of Oklahoma Standard under petitioners' plan. As to the Gruber Project, petitioners include about 73 per cent of the profit of $155,488.34 as income earned to the time the contracts were about 91 per cent completed. The discrepancy is much greater if the renegotiation refund, the amount of which was unknown on September 20, 1942, is taken into account. A like situation prevails as to the Dalhart Project. Moreover, on the basis of the final notices of acceptance, the Roads Project was completed and the Gruber Project was substantially completed prior to the reorganization. Notices of the completion of the Roads and Dalhart projects were given before the filing of the final return of Oklahoma Standard. The respondent eliminates uncertainties about the final financial outcome of the contracts and allocates the profits on a percentage of completion having a reasonable basis under the circumstances prevailing here.

Petitioners assert that respondent's computation overstates the actual profits from the Gruber Joint Venture by $73,325.01, and infers that the percentage should be applied to the net profit of $155,488.34, which was reported as profit after deducting $73,325.01 for a refund made under renegotiation and loss on sale of equipment. Oklahoma Standard's share of the refund, amounting to $41,666.67, was eliminated from income by the respondent in his computation of the deficiencies and a deduction, reduced to $21,941.86, was allowed for loss on sale of the equipment, in view of which the total taxable to both corporations will not exceed the lower figure of $155,488.34.

Accordingly, we hold that Oklahoma Standard realized taxable income in the amount of $208,998.11 from the Gruber Joint Venture;

$90,293.19 from the Dalhart Joint Venture; and $12,531.80 from the Memorial Boulevard contract.

(2) Petitioners contend that the net operating loss which will result from a shifting of income from Delaware Standard for the year ended September 30, 1943, to Oklahoma Standard for the taxable period ended September 20, 1942, is deductible by Oklahoma Standard. They assert, without discussion, that the nontaxable reorganization brings the deduction within the provisions of sections 23 (s) and 122 of the code.

Respondent contends that net operating losses are deductible as carry-backs only by the same taxpayer and the result is not changed by a tax-free reorganization.

Section 23 (s) allows as a deduction in computing net income "the net operating loss deduction computed under section 122." Section 122, to the extent material here, provides in subsection (b) (1) that "If for any taxable year beginning after December 31, 1941, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-back for each of the two preceding taxable years * * * ."

It is well established that deductions may not be taken without clear legislative authorization. In *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435, the petitioner upon its organization in 1922 took over the assets and liabilities of a corporation which had sustained statutory net losses in 1921 and 1922 prior to the transfer. The corporate existence of the old corporation continued in 1922 and 1923. The Court pointed out that "the statutes have disclosed a general purpose to confine allowable losses to the taxpayer sustaining them." The applicable statute provided, to the extent material, that if "any taxpayer has sustained a net loss, the amount thereof shall be deducted from the net income of the taxpayer for the succeeding taxable year." The Court, in denying the deductions, held that the provision meant "that the taxpayer who sustained the loss is the one to whom the deduction shall be allowed." It further held under an alternative contention that the deductions were not allowable upon the asserted ground that for all practical purposes the two corporations were the same taxpayer.

In the *Phipps* case, *supra*, the Court declined to recognize deficits of retiring corporations in a nontaxable reorganization as deficits of the continuing corporation.

We cited the *New Colonial* case in *Michael Carpenter Co.*, 47 B. T. A. 626, where there was a tax-free reorganization. The new corporation acquired the assets and business of the old, including claims for reimbursement from certain mills. We held that amounts received by the new corporation on settlement of the claims were income to it, stating

that the situation was comparable to one involving deduction of statutory net loss by an entity separate from the one sustaining, and that a loss by the old corporation was not transferable to or useable by the new corporation.

In *Winter & Co. (Indiana)*, 13 T. C. 108, the taxpayer did not engage in any business operations after April 30, 1942, and, under the prevailing circumstances, in a practical sense ceased to exist. We held that taxable periods after April 30, 1942, were not included in the taxpayer's cycle of years for the carry-back of unused excess profits tax credits, and that the taxpayer could not have an operating loss in 1944 for carry-back purposes.

Here Oklahoma Standard was dissolved in September 1942 and thereafter ceased to exist as a corporate entity. It did not have, and, as it was not in existence, could not have had, an operating loss during the fiscal year ended September 30, 1943.

We know of no statutory provision relating to nontaxable reorganizations in any way altering the rule in the *New Colonial Ice Co.* case. The transaction here, instead of continuing the life of Oklahoma Standard, put it to death. To allow Oklahoma Standard to deduct the loss sustained by Delaware Standard in a subsequent year would call for the recognition of the former not only as a continuing corporation, but with a right to take deductions sustained by another corporation after it ceased to exist. Had Congress intended to confer such an unusual tax benefit, it is believed it would have expressed it in clear language.

We find nothing in *Stanton Brewery, Inc. v. Commissioner*, 176 Fed. (2d) 573, reversing 11 T. C. 310, helpful to petitioners. There the question was whether the taxpayer, the resulting corporation after a merger, could carry over, under the provisions of section 710 (c) (3) (B) of the code,[4] in determining its excess profits net income, the unused excess profits credit of one of its components for the two years prior to the merger. The Court allowed the carry-over upon the broad ground that there was essentially a continuing enterprise and that the union of the corporations carried with it the rights and obligations of the component corporations. The conclusion was induced by the liability of the taxpayer for taxes of the former corporations. The result of the decision was to treat the petitioner

---

⁴ SEC. 710. IMPOSITION OF TAX.

   *       *       *       *       *       *       *

  (c) UNUSED EXCESS PROFITS CREDIT ADJUSTMENT.—

   *       *       *       *       *       *       *

  (3) AMOUNT OF UNUSED EXCESS PROFITS CREDIT CARRY-BACK AND CARRY-OVER.—

   *       *       *       *       *       *       *

  (B) Unused Excess Profits Credit Carry-Over.—If for any taxable year beginning after December 31, 1939, the taxpayer has an unused excess profits credit, such unused excess profits credit shall be an unused excess profits credit carry-over for each of the two succeeding taxable years * * *.

therein as "the taxpayer" within the meaning of section 710 (c) (3) (B).

There is no basis here for following the reasoning of the Circuit Court in the *Stanton Brewery, Inc.*, case, even assuming that we agreed with that case. The question is not one of the status, in the hands of a transferee corporation, of a deduction earned by a transferor corporation, but the reverse thereof, and involves a loss not sustained until after the transferor corporation ceased to exist. The reorganization here, it is true, continued the enterprise, yet Oklahoma Standard, instead of acquiring rights and assuming obligations, gave up everything it had in the reorganization in favor of Delaware Standard. The operating loss involved herein resulted from operations of the surviving corporation after the transfer and is not associated in any way with business conducted by Oklahoma Standard during its existence. Thus, we do not have a benefit to continue in favor of a succeeding corporation, but a loss of another corporation that did not come into existence until after Oklahoma Standard ceased as a corporation.

On this issue we hold for the respondent.

(3) Oklahoma Standard, which used an accrual basis of accounting and reporting income, seeks as a deduction in the taxable period additional Oklahoma income taxes assessed and paid in such period for the year 1938.

It is well established that taxes accrue for deduction purposes when all of the events occur to fix the amount thereof and determine the liability to pay it. *United States* v. *Anderson*, 269 U. S. 422; *Uncasville Mfg. Co.* v. *Commissioner*, 55 Fed. (2d) 893; *Keller-Dorian Corporation* v. *Commissioner*, 153 Fed. (2d) 1006; *Rawlings Manufacturing Co.*, 44 B. T. A. 161; *Oregon Pulp & Paper Co.*, 47 B. T. A. 772, 780; *Burton-Sutton Oil Co.*, 3 T. C. 1187, 1196; *Great Island Holding Corporation*, 5 T. C. 150. Here all of the events occurred in 1938 to fix the amount and the liability to pay. The failure of Oklahoma Standard to report its correct income tax liability does not alter the situation, for the discovery of the error related back to the year when the mistake was made. *Haverty Furniture Co.*, 20 B. T. A. 644. That Oklahoma Standard did not know of the amount of the additional tax until 1942, does not control. The same was true in *Oregon Pulp & Paper Co.*, *supra*, yet we denied deduction of taxes paid, which had, however, accrued in an earlier year.

However, Oklahoma Standard contends that the additional taxes were deducted in the taxable period in accordance with a consistent practice, and that such departure from the method of accounting regularly employed by it is permissible in the absence of proof that the isolated departure from the usual method distorted income. The decisive question is the year in which the tax is deductible under the

governing statute. That year, as already shown, is 1938. Allowance of the amount as a deduction in the taxable period is not only opposed by a well established rule, but, in our opinion, would distort, rather than correctly reflect, income for such period.

On this issue we hold for the respondent.

Oklahoma Standard did not in its petition contest the respondent's determination against it for the year 1941. The transferee liability asserted by the respondent for that year and the taxable period in 1942 was placed in issue by Delaware Standard, but no specific errors were alleged in computing the deficiency of $104.67 in income tax against Oklahoma Standard for 1941. Such errors as Delaware Standard alleged concerned tax liability of Oklahoma Standard and upon brief it does not contest its liability as a transferee for any deficiencies determined against the transferor. Accordingly, we find that Delaware Standard is liable as a transferee for the deficiency of $104.67 in income tax for 1941, and the deficiencies in declared value excess profits tax and excess profits tax for the taxable period January 1 to September 20, 1942, will be computed and

*Decision will be entered under Rule 50.*

Reviewed by the Court.