Luther G. Turner and Ruth Turner v. Commissioner.
Turner v. Commissioner
Docket No. 64207.
United States Tax Court
T.C. Memo 1958-181; 1958 Tax Ct. Memo LEXIS 44; 17 T.C.M. (CCH) 914; T.C.M. (RIA) 58181; September 30, 1958
W. S. Miller, Jr., Esq., for the petitioners. Frederick T. Carney, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined the following deficiencies in income tax and additions to tax: Additions to Tax
I.R.C. 1939
Income
Sec. 294
Sec. 294
Year
Tax
(d)(1)(A)
(d)(2)
1952
$ 2,248.86
1953
14,605.86
$1,265.39
$813.59
The deficiency for 1952 arises from the disallowance of an operating loss carryback from 1953. The only issue for decision is whether a certain construction contract was finally completed and accepted in 1953 or 1954. Findings of Fact Some of the facts were stipulated, are so found and the stipulation together with the pertinent exhibits are included herein by reference. The petitioners *45 are residents of Memphis, Tennessee, and filed their joint Federal income tax returns for the calendar years 1952 and 1953 with the director of internal revenue for the district of Tennessee in Nashville. During the years 1952 and 1953 petitioner Luther G. Turner was engaged in business as a contractor and filed his income tax returns on the completed contract basis. On April 8, 1952, Luther entered into a long-term contract with S. & W. Construction Company, Inc., for plastering and lathing work on the Hurt Village Housing Project in Memphis, Tennessee. S. & W. was the prime contractor for the construction of this Federal housing project for the Memphis Housing Authority. The contract provided for payment by the contractor to the subcontractor of $343,000; 90 per cent of the value of all work incorporated in the structure to be paid on or before the tenth of the month following that in which the work is done; 50 per cent of the balance to be paid 40 days after final completion and final approval and acceptance by the contractor and by the architect and the balance 30 days after completion and acceptance of the work by the architect. The architect named in the contract was A. L. *46 Aydelott & Associates. During the year 1953 petitioner received payments on the aforesaid contract in the total amount of $325,238.25, which represented 95 per cent of the total payments that he was to receive on the completed contract. During the year 1953 petitioner incurred costs in the performance of the contract in the total amount of $298,625.05. During the year 1954 petitioner received payment on the aforesaid contract in the amount of $17,076.22, which represented the remaining 5 per cent on the contract. The final payment was received on February 28, 1954, after the final acceptance of the entire housing project, including the work done by petitioner, by the Memphis Housing Authority. During the year 1954 petitioner incurred costs on completion of performance of the contract in the amount of $2,175.33. (This figure was stipulated to be $2,175.13 but, based on joint exhibit 6-G, it appears it should be $2,175.33.) On October 31, 1953, the prime contractor submitted a "periodical estimate for partial payment," in which it reported that 93.5 per cent of the entire housing project had been completed and the plastering and lathing was reported thereon as 100 per cent complete. *47 In making the estimate of 100 per cent completion on the plastering and lathing. the prime contractor, among other things, was trying to get that much money on the estimate filed. This report was approved by the construction engineer for the Public Housing Administration whose duties, in part, were to make daily inspections of the work on the project and to approve the monthly PHA Forms 1001 before they were transmitted to the Memphis Housing Authority and payments made to S. & W. The periodical estimate dated October 31, 1953 was signed by the assistant director of construction for the Memphis Housing Authority. This report which was approved by the construction engineer meant that the plastering and lathing work was acceptable to both the Public Housing Administration and the Memphis Housing Authority and suitable for the tenants to move in, notwithstanding any repairs and pointing up that might subsequently develop. The project included many separate dwelling structures, and the Memphis Housing Authority liked to get the people into them as soon as possible. Subsequent to October 31, 1953, the petitioner expended the following amounts for costs in connection with the performance *48 of the contract: Labor
Materials
Month of November, 1953
$827.50
$ 65.38
Month of December, 1953
574.26
660.02
Month of January, 1954
812.00
200.02
Month of February, 1954
372.12
2.95
Month of March, 1954
788.24
On January 25, 1954, Engineer's Report No. 148 prepared by the engineer for the Memphis Housing Authority, listed 39 separate items of work required of the plastering contractor before acceptance by the Memphis Housing Authority. On January 26, 1954, a similar report by the engineer listed 71 such items; on January 27, 1954, a similar report listed 49 additional items to be done by the plastering contractor before acceptance by the Memphis Housing Authority. At the time these reports were made tenants had been in the apartments for an undisclosed period of time. On February 3, 1954, the prime contractor wrote to petitioner, enclosing the reports, stating that the items thereon must be corrected to the satisfaction of the Memphis Housing Authority prior to the date of the final inspection. On February 19, 1954, the assistant director of construction for the project advised the prime contractor by letter that final inspection would *49 begin at 8:30 A.M., February 23, 1954. Many of the items contained in the engineer's reports were for the repair of cracks and "pointing up." These items were part of the original contract between petitioner and the prime contractor. They were not items added after execution of the contract, known as Change Orders. None were items of major importance. It is common experience that some cracks will develop and that certain touch-up and point-up work will be necessary after plaster work is completed. Final acceptance of housing projects even though such items, which are referred to as "punch list" items, remain uncorrected is considered commonplace. The general contract provided that the Memphis Housing Authority could require the prime contractor or any subcontractor to redo any defective work within a period of one year following completion and acceptance of the project. The Housing Authority would not accept the project on final inspection if the contractor or subcontractor had failed to do anything required under their original undertaking, and in addition could require touch-up work or redoing of defective work for one year following final acceptance. The entire project was *50 accepted by the Housing Authority February 23, 1954. In determining the deficiencies herein the Commissioner explained as follows: "It is determined that you realized income from a subcontract with S. & W. Construction Co., Inc. for the plastering and lathing work on the Hurt Village Housing Project contract in the amount of $41,514.29, and that such income is properly includible in your taxable income for the taxable year ended December 31, 1953. Inasmuch as you reported no income from this contract on your 1953 return, your taxable income has been increased in the amount of $41,514.29. Section 42, Internal Revenue Code of 1939 and section 39.42-4, Regulations 118." Opinion There is no dispute whether or not petitioner was entitled to use the "completed contract" method of reporting income. He did this in the taxable years and the only question we have to decide is whether the Commissioner's determination that petitioner should have reported income from his subcontract with S. & W. Construction Company in 1953 is correct. Regulations 118, section 39.42-4, which is here involved, requires reporting of income on the completed contract method for the taxable year "in which *51 the contract is finally completed and accepted." In this case petitioner insists that the proper year for reporting income from the S. & W. contract was not 1953, but, presumably, the year 1954 when the final inspection by the Housing Authority of the whole project was completed and the entire project accepted. We do not agree with petitioner. It was his burden to prove error in the Commissioner's determination and the question is one of fact, the answer hinging on the contract itself and all of the evidence relating to the conduct of the parties acting pursuant to the contract. Upon the evidence we have concluded that the contract in question was completed and for all practical purposes accepted in 1953. Petitioner argues for a literal and what we suppose is a "strict" interpretation of the regulation which uses the terms "finally completed and accepted." But this Court has said that the "completed contract method does not require completion of more than all important particulars called for by a contract." Standard Paving Co., 13 T.C. 425, 439. And in V. T. H. Bien, 20 T.C. 49, 55 we said "Jobs under that system [completed contract] must be closed *52 out in the year in which substantially completed." See also Ehret-Day Co., 2 T.C. 25 and cf. E. E. Black, Limited v. Alsup, 211 Fed. (2d) 879 (C.A. 9), reversing District Court and saying Ehret-Day Co. "was wrongly decided." In the case before us we think the contract was substantially completed in 1953. For the purpose of justifying payment from the Housing Authority the prime contractor in October of that year, with the approval of the Housing Authority engineer whose duty it was to make inspection daily of work on the project, certified that the plastering and lathing work was 100 per cent complete. To the engineer this meant, in his own words Q. "Now, when you say it was one hundred percent complete, what did that mean to you? A. "Well, that means that it was acceptable and that it was suitable for the tenant to move in. Of course, there may be things that would develop afterwards, but that is acceptable to the Memphis Housing Authority and to the Public Housing Administration. * * *
Q. "Are you familiar with the details of the final inspection of this work, of the entire project? A. "Yes. I made the final inspection. Q. "Did you have *53 anything to do with getting out the so-called 'punch list' items? A. "Yes, sir, I helped to get them out. Q. "And notwithstanding that, you still considered at the date of this report, October 31, that this plaster work was one hundred percent complete and accepted? A. "That is correct. Acceptable to the Government and to the Memphis Housing Authority. * * *
Q. "When you say 'acceptable', you really mean accepted? A. "That particular phase of the contract, the lathe and plaster." True there were cracks that developed thereafter and pointing up, too, but we consider correction of these things to be of minor importance in determining when the work to be performed under petitioner's contract was completed and accepted. They were the type of imperfections that could be corrected within a year following the acceptance of the entire project by the Housing Authority. Completion and acceptance in 1953 is further shown by the fact that at the time the punch lists were prepared listing these minor imperfections in January of 1954 the apartments were already occupied by tenants and that 95 per cent of the contract price had been paid to petitioner by S. & W. We do not think *54 that "completion" and "acceptance" as used in the regulations should be interpreted to mean that a contract of the magnitude here involved is not completed and accepted until every jot and tittle has been perfectly performed. So to interpret the regulation would be impractical and could lead to postponing the incidence of taxation, which is a highly practical matter, for indeterminate periods during which disputes between contractors and others were being ironed out. With respect to the items shown on the "punch list" the project engineer in his testimony indicated that the items listed were such as inevitably show up in lathing and plastering and that it was common practice to accept work as acceptable and complete despite the fact that such defects have not yet been rectified. As we said in Ehret-Day, supra, at page 34 - "In our opinion, the regulations do not contemplate that a building contract which has been completed in all important particulars, except for minor defects, as was the Fredericks contract, shall be regarded as uncompleted until such time as the minor defects may actually be corrected or adjustment made therefor. * * *" We hold that petitioner *55 has not shown error in the Commissioner's determination that petitioner should have reported income from the contract with S. & W. in the year 1953. Petitioner has made no argument against imposition of the additions to tax in the event we hold, as we do, for the Commissioner on the primary issue. Decision will be entered for the respondent.