Thomas W. Briggs et al. [1] v. Commissioner. Briggs v. Commissioner
Docket Nos. 36512, 43484, 45178, 48934. .
United States Tax Court
T.C. Memo 1956-86; 1956 Tax Ct. Memo LEXIS 208; 15 T.C.M. (CCH) 440; T.C.M. (RIA) 56086; April 16, 1956
Robert Ash, Esq., Charles H. Burton, Esq., and Carl F. Bauersfeld, Esq., for the petitioners. W. Preston White, Jr., Esq., for the respondent. JOHNSON Memorandum Findings *209 of Fact and Opinion JOHNSON, Judge: In these consolidated proceedings the Commissioner determined deficiencies in income tax and surtax under section 102, Internal Revenue Code of 1939, as follows: Deficiency
Dkt. No.
Petitioner
Year Ended
Income Tax
Surtax - § 102
36512
Thomas W. Briggs
12/31/46
$ 75,283.05
12/31/47
4,629.20 *
48934
Thomas W. Briggs and Kathleen S. Briggs
12/31/48
69,934.49
12/31/49
46,392.44
43484
Welcome Wagon, Inc.
6/30/47
116,229.02
6/30/48
77,446.15
$ 49,514.63
45178
Welcome Wagon, Inc.
6/30/49
80,583.94
117,127.55
6/30/50
66,771.90
127,354.71
The issues for decision are as follows: 1. Whether petitioner, Welcome Wagon, Inc., is subject to the surtax imposed by section 102 of the Internal Revenue Code of 1939, for its fiscal years ended June 30, 1948, to June 30, 1950, inclusive. 2. (a) Did Welcome Wagon, Inc., keep its books and properly report its income on the cash receipts and disbursement basis of accounting; and (b) did Thomas W. Briggs keep his books and properly report his income *210 on the same basis? 3. Is the income from the collection of certain accounts receivable transferred to Welcome Wagon, Inc., by Thomas W. Briggs on October 31, 1946, taxable to Thomas W. Briggs? 4. Were the expenses of maintaining and operating the houseboat Coronet deductible by Welcome Wagon, Inc., as ordinary and necessary business expenses? 5. Is Welcome Wagon, Inc., entitled to any deductions for travel and road expenses for its fiscal years ended June 30, 1947, to June 30, 1950, inclusive, and for general expenses for its fiscal years ended June 30, 1949, and June 30, 1950, in excess of the amounts allowed by the respondent? 6. If the Court should find that the expense in connection with the operation of the houseboat and the traveling, road and general expenses referred to above were not ordinary and necessary business expenses of Welcome Wagon, Inc., were they personal expenses of Thomas W. Briggs and taxable to him as dividends from Welcome Wagon, Inc.? 7. Were certain travel and other expenses incurred by Thomas W. Briggs in connection with the operation of the Canadian business as a sole proprietorship ordinary and necessary business expenses? 8. Is Thomas W. Briggs *211 entitled to additional deduction for medical expenses in the taxable year ended December 31, 1947, above the amount allowed by respondent? 9. Was the gain derived by Kathleen S. Briggs from the sale of real estate during the taxable years in question taxable to her as ordinary income or as long term capital gain? The agreed stipulations and concessions of the parties will be given effect under the Rule 50 computation. Claim for refund was filed by Welcome Wagon, Inc., for the year ended June 30, 1948, for income tax in the amount of $7,408.80 and for surtax under section 102, Internal Revenue Code, in the amount of $59,982.99. General Findings of Fact The facts stipulated, together with the exhibits attached thereto, are adopted and made a part hereof. Thomas W. Briggs, hereinafter called Briggs, and Kathleen S. Briggs, hereinafter sometimes called Kathleen, are husband and wife residing in Memphis, Tennessee. Welcome Wagon, Inc., hereinafter called either Welcome Wagon or the Corporation, is a Delaware corporation with its principal office in Memphis, Tennessee. Briggs filed his individual income tax returns for the calendar years 1946 and 1947. *212 Briggs and Kathleen filed joint income tax returns for the calendar years 1948 and 1949. Welcome Wagon filed its corporation income tax returns for the fiscal years ended June 30, 1947, 1948, 1949 and 1950, inclusive, respectively. All of the foregoing returns were filed with the then collector of internal revenue for the district of Tennessee. Welcome Wagon was orginally incorporated in 1946 as Welcome Wagon Service Company, Inc., but its name was changed to Welcome Wagon, Inc., on October 21, 1948. For some 18 years prior to November 1, 1946, the so-called business of Welcome Wagon was owned and operated by Briggs as sole proprietor. Upon the advice and insistence of his attorneys, Briggs incorporated same, and after November 1, 1946, and throughout the years in question the business was owned and operated by the Corporation, of which Briggs was sole stockholder and president. The nature of the business and its method of operation, both under private and corporate ownership, was the same. The business is unique and unusual. It sells no product, has no inventory and is purely a service organization. Throughout each of various cities and towns in the United States it has one *213 or more women employees, herein called "hostesses", who make personal calls upon newcomers to a community, mothers of newborn babies, families moving from one home to a new home, boys and girls reaching their 16th birthday, brides and grooms-to-be and special anniversary calls, etc. Upon these calls the hostess brings information about local civic, religious and charitable organizations and also makes gifts to the family from commercial sponsors. Illustrative of the type of gifts presented, viz: a bakery donates a loaf of bread or some cookies, a dairy a bottle of milk, a department store may give a pair of ladies hose, etc. With respect to the civic, charitable and religious organizations, the hostess urges the family to assist such organizations. With respect to the commercial sponsors she advertises their various products and suggests to the family that it use their services or otherwise patronize them. No charge is made for services to religious and charitable organizations. Welcome Wagon receives its compensation by charging each commercial sponsor from 60 cents to $1.50 for each call of the hostess. The rates are uniform but vary for different classifications of sponsors. The *214 commercial sponsors are local business men such as drug stores, laundries, bakeries, beauty parlors, department stores, dairies, filling stations, etc. The hostesses are compensated for their services on a commission basis. The hostess receives 50 per cent of the amounts collected from the commercial sponsors. In addition to local hostesses, there are area supervisors who receive 10 per cent of amounts collected from commercial sponsors. A supervisor may supervise all hostesses in a particular state, or in large cities a city will have a supervisor. In addition there are some general supervisors who are national representatives. They also receive a percentage of commissions that are collected. Hostesses are carefully selected, usually from those active in local community affairs. They are first required to take a two weeks' training course given by Welcome Wagon, either in New York, Memphis or Los Angeles. After serving for a period, they are also required to take refresher courses in either New York or Memphis. Hostesses make daily reports to sponsors and to the New York or Memphis office of Welcome Wagon. They also sometimes organize Welcome Wagon Clubs for newcomers in a community; *215 Lullaby Clubs for mothers of new-born babies; Teen-age Clubs, etc. From 1946 to 1950, inclusive, Welcome Wagon employed hostesses, operated in towns and cities in the United States and represented commercial sponsors approximately as follows: Towns
Hostesses
and
Year
Employed
Cities
Sponsors
1946
1300
776
10,000
1947
1500
800
12,000
1948
1950
900
15,000
1949
2400
1050
20,000
1950
3000
1235
25,000
The Corporation declared no dividend in either of the years ended June 30, 1947, 1948 or 1949, but did declare a dividend of $50,000 in the year ended June 30, 1950. The salary it paid Briggs as president for the year ended June 30, 1947, was $16,000, and for each of the other three years in question it paid him an annual salary of $24,000. During the fiscal years in question the Corporation paid its other officers salaries as follows, cents omitted: Name
Office
1947
1948
1949
1950
Raymond M. Briggs
Vice Pres.
$3,600
$ 5,400
Merle Reed
Sec'y & Vice Pres.
1,800
3,000
$3,327
$3,648
Helen Parry
Treasurer
1,800
3,000
3,025
2,988
Helen Archer
Asst. Treas.
1,180
2,133
2,371
Eric Lord
Vice Pres.
3,600
6,000
6,655
7,865
Katherine Mara
Vice Pres.
2,800
4,500
4,961
5,445
Marjorie Stevens
Asst. Sec'y
1,800
2,880
3,085
3,780
Rita Staiger
Asst. Sec'y
1,800
3,000
3,327
3,630
Rosanne Beringer
Vice Pres.
10,000
7,057
8,618
*216 In 1934 Briggs opened a branch office for the business in New York City, and in 1940 another branch office was opened in Los Angeles, both of which continued to operate. The nature of the business required a considerable office staff to operate, and as it expanded this necessarily increased the cost. For the year ended June 30, 1947, there was expended for office salaries $69,911.36; for the year ended June 30, 1948, $153,529.32; for 1949, $243,020.79, and for 1950, $320,475.83. The Corporation reported on its corporation income tax returns for its fiscal years ended June 30, 1947, to June 30, 1950, inclusive, taxable income and tax due in amounts as follows: Year Ended
Taxable Income
Tax Due
June 30, 1947
$122,452.35
$ 46,531.90
June 30, 1948
334,594.95
127,135.03
June 30, 1949
394,278.13
149,681.50
June 30, 1950
544,855.42
207,008.40
The fees collected by the Corporation for each of its fiscal years ended June 30, 1947, to June 30, 1950, inclusive, were as follows: Fees Collected
Year Ended
During Year
June 30, 1947
$1,001,973.27
June 30, 1948
2,187,788.22
June 30, 1949
2,991,846.86
June 30, 1950
3,601,662.54
The *217 Corporation had accounts receivable at the end of each of its fiscal years ended June 30, 1947, to June 30, 1950, inclusive, as follows: Accounts Receivable
Year Ended
End of Year
June 30, 1947
$290,186.90
June 30, 1948
539,833.00
June 30, 1949
691,813.48
June 30, 1950
815,737.53
Briggs reported in his individual income tax returns for the calendar years 1943 to 1947, inclusive, taxable income and tax due thereon as follows: Year Ended
Taxable Income
Tax Due
December 31, 1943
$ 31,246.71
$ 12,379.58
December 31, 1944
16,329.67 *
3,143.66
December 31, 1945
75,405.56 *
43,450.97
December 31, 1946
204,583.98 *
143,481.46
December 31, 1947
56,297.30 *
9,975.93
Briggs and Kathleen reported in their joint income tax returns for the calendar years 1948 and 1949 taxable income and tax due thereon as follows: Year Ended
Taxable Income
Tax Due
December 31, 1948
$103,270.23 *
$31,209.20
December 31, 1949
104,608.35 *
30,931.24
The surplus of Welcome Wagon for its fiscal years ended June 30, 1947, to June 30, 1950, inclusive, without taking *218 into consideration the disallowed deductions in the statutory notices of deficiency, on both a strict cash basis of accounting and on a strict accrual basis of accounting, was as follows: Year
Cash Basis
Accrual Basis
June 30, 1947
$ 126,578.68
$ 120,573.90
June 30, 1948
416,872.86
442,457.40
June 30, 1949
685,807.89
786,657.79
June 30, 1950
1,028,607.79
1,155,156.25
During the war years 1942 to 1944, inclusive, the business of Welcome Wagon was not good. It lost about one-half of the cities in which it was operating and Briggs had to advance outside personal funds to keep it in operation. In 1943 the business had gross income of $540,207.40, and net income of $4,822.88, and in 1944 a gross income of $513,562.91 and a net income of $2,177.09. The business is particularly sensitive to business hazards and ecomonic conditions. The business, in the years 1948, 1949 and 1950, needed a substantial amount of working capital. It had over 500 employees on a fixed salary basis. In 1948 it had a payroll obligation of $150,000 per month and administrative overhead expenses of approximately $40,000 per month. In June 1949 the monthly payroll obligation was approximately *219 $190,000 and its administrative overhead expense was about $55,000. In June 1950 the payroll obligation was $200,000 and administrative overhead $60,000. During these years the Corporation had only a minimum amount of working capital. The Corporation in 1949 and 1950 attempted to obtain an unsecured or open line of credit with banks in Memphis and New York, but was unsuccessful, the reason being that it was a service organization, had no inventory, very few tangible assets and its uncollected service fees were in small amounts from thousands of small merchants all over the United States and were not considered bankable paper. During the years 1948, 1949 and 1950 the Corporation was planning for expansion of its business by beginning operations in Europe. In 1948 Welcome Wagon sent a representative to Europe to make a survey to determine the feasibility of opening the business there. Upon authorization from the Corporation, Briggs, in 1949, also made a trip to Europe to further investigate the possibility of opening the business there. Attorneys in several European countries were consulted as to the laws affecting the operation of such business, and in 1950 Welcome Wagon began training *220 personnel in its New York office to become field representatives in Switzerland, Holland and possibly one or two other European countries. Because of the Korean War, which began in June, 1950, and the fear that it was the beginning of another World War, the establishment of the business in Europe was not carried out. In 1948 and at all times prior thereto, Welcome Wagon occupied rented quarters for its business in Memphis, New York and Los Angeles, but at that time and for several years it had been looking for buildings in these cities which it could buy for this purpose. The minutes of the Directors' meeting on August 3, 1948, recited that the Corporation then had under consideration the purchase of buildings in Memphis and New York and stated that: "No dividend has been declared * * * as in the event we are successful in our negotiations for the purchase of a building in New York City and Memphis then and in that event we would not only need all the ready cash that the corporation has available but we would also have to borrow additional money in order to consummate the deal." Welcome Wagon bought a five-story building in July, 1949, in Memphis, known as the old Commercial *221 Appeal Building, for $225,000 in cash. It had been negotiating for such purchase for more than a year but could not agree on the price. The minutes of the Directors' meeting of October 26, 1949, after reciting the purchase of the building in Memphis, stated that for the past two years unsuccessful efforts had been made to purchase a suitable building in New York at a reasonable price, but such efforts were still being continued. Expanding business had materially increased the number of Welcome Wagon's employees, requiring each year more space, and it was also thought that ownership of buildings in these cities by the name of Welcome Wagon would add to its prestige and be of advertising value. Furthermore, it had experienced difficulty in securing proper rental quarters, especially in New York City, where it had been required to move three different times, and in 1949 it could not secure a renewal of its lease at 345 Madison Avenue and offered to purchase the building for $1,000,000, but the offer was rejected. In 1950 Welcome Wagon considered buying a building called the Domingue Building, in Los Angeles, California, and made an offer of $950,000, which offer was rejected. *222 In May, 1951, it purchased an eighteenstory building at 685 Fifth Avenue in New York for $1,475,000, making a cash payment of $749,667.71 and taking title subject to a prior mortgage of $725,332.29. In making the cash payment, Welcome Wagon used $500,000 of its own funds and borrowed an additional $250,000 from a New York bank. The Memphis and the New York buildings were both bought by Welcome Wagon in which to conduct its business in those cities, and were so used. Each building had more space than was required for this purpose and it rented the excess space to others. Welcome Wagon's surplus and cash on hand was as follows: Date
Surplus
Cash
As of June 30, 1948
$275,234.30
$251,921.27
As of June 30, 1949
516,992.14
514,951.87
As of June 30, 1950
806,119.89
631,831.76
Welcome Wagon had a liability of Federal income taxes, administrative overhead expense and monthly payroll average as follows: Administrative
Average
Date
Income Tax
Overhead Expense
Monthly Payroll
As of June 30, 1948
$127,000
$40,000 per month
$150,000
As of June 30, 1949
150,000
55,000 per month
190,000
As of June 30, 1950
207,000
60,000 per month
200,000
*223 Among the reasons actuating the management of Welcome Wagon in failing to declare dividends in the years involved was need of cash to purchase buildings, to meet its large fixed liability of Federal income tax, administrative overhead expense, monthly payroll, etc., to provide for the expansion of the business in the United States and foreign countries, and for working capital. The general counsel of Welcome Wagon, who kept in touch with its financial condition and was frequently conferred with, advised the directors not to declare a dividend, even in 1950 when one was declared. The business of Welcome Wagon was incorporated to insure its continuity in the event of Briggs' death. It had grown from a local to a national business and was operating in nearly every state in the Union, and it was not feasible to continue its operation as a sole proprietorship. The deficiency notices held that Welcome Wagon, Inc., was formed and availed of in the years ended June 30, 1948, 1949 and 1950, for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate beyond the reasonable needs of the business. Ultimate *224 Finding: Welcome Wagon, Inc., was not originally formed, nor was it availed of during any of the years ended June 30, 1948, to June 30, 1950, inclusive, for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate beyond the reasonable needs of the business. Issue 2. Facts Found: [2]Welcome Wagon maintains a double-entry set of books with a general ledger and subsidiary ledgers, journals, payroll records and cash records. It kept its books in the taxable years and prior thereto on a cash receipts and disbursements basis of accounting with the minor exception of payroll taxes, such as Social Security and Old-Age benefits. These payroll taxes are accrued on the books in order to keep the amounts deducted from the employees and the amount to be contributed by the company on an equal basis. However, when the income tax returns are filed, all of which are filed on a cash basis, these accruals are reversed to a cash basis so that the only amounts deducted on the tax returns are the amounts actually *225 paid. These accruals are limited to salaries and commissions actually paid and do not cover any accrued salaries or unpaid commissions. The accrued payroll taxes are not substantial items of expense or deduction. Revenue Agent Samuel Rubinstein, for the internal revenue bureau, investigated the tax returns and examined the books and records of Thomas W. Briggs for the years 1946 and 1947, and Welcome Wagon, Inc., for the taxable periods ended June 30, 1947, and June 30, 1948. He filed with the bureau reports based on his examination, in both of which he determined that both of these taxpayers, for the years in question, were on a cash basis. Rubenstein was subpoenaed as a witness for the respondent, was present at the trial but was not called as a witness for the respondent and did not testify. Respondent's Revenue Agent Reed made an investigation of the tax returns and examined the books and records of Thomas W. Briggs and Kathleen S. Briggs for the years 1948 and 1949, and of Welcome Wagon, Inc., for the years ended June 30, 1949, and June 30, 1950, in New York City. He was subpoenaed as a witness for the respondent, was present at the trial but was not called as a witness for *226 the respondent, and did not testify. In respondent's answer to the original petition for Welcome Wagon, Inc., covering the years ended June 30, 1947, and June 30, 1948 (Docket No. 43484) it is alleged: "5.(c)(1). Admits that the petitioner kept its books and records on a cash basis and the fact was so stated in the examining officer's report. * * *" In the Commissioner's notices of deficiency issued herein it is determined as follows: In Docket No. 43484, Welcome Wagon, Inc., for the year ended June 30, 1948: "It is held that your taxable income is properly reportable on the accrual basis, and therefore, it becomes necessary to include in taxable income the amount of $184,573.31. See explanation 2 under Year June 30, 1948, in the preliminary statement for further discussion of this adjustment." In Docket No. 45178, Welcome Wagon, for the years ended June 30, 1949 and 1950: "It is held that your taxable income is properly reportable on the accrual basis, and therefore, it becomes necessary to include in taxable income the amount of $163,722.58, computed as follows: "Balance of unrealized income
as at June 30, 1949,
$630,064.45
Balance of unrealized income
as of June 30, 1948,
466,341.87
$163,722.58"
*227 In Docket No. 48934, Briggs and Kathleen, for the years ended December 31, 1948 and 1949, the deficiency notice stated: "In your return for the year 1948, under adjustments decreasing income made in the amount of $582.68, to place the return on a cash basis it has been determined that income should be reported on the accrual basis, therefore net income is increased by $582.68. "In your return for the year 1949, under adjustments increasing income made in the amount of $1,100.40, to place the return on a cash basis it has been determined that income should be reported on the accrual basis, therefore net income is decreased by $1,100.40." In Docket No. 36512 the statutory notice of deficiency issued therein did not raise the accounting method issue, but such issue was first raised by respondent in his amended answer therein filed on June 2, 1955, wherein it was alleged that Briggs kept, or should have kept, his books and records on an accrual basis of accounting, but failed to do so, and in his income tax returns attempted to report his income on a cash basis of accounting. Ultimate Finding: The books and records of Welcome Wagon and the other petitioners herein, during all *228 of the taxable years involved, were kept in accordance with the method regularly employed by them and was predominantly on a cash basis of accounting, and they reported their income for taxes on a cash basis. The books and records of petitioners as kept clearly reflected their income. Issue 3. Facts Found: On October 28, 1946, Briggs sold and transferred as a going concern the business theretofore conducted by him, together with all of its assets and liabilities, to the newly formed corporation, Welcome Wagon, in exchange for all of the capital stock of the corporation, consisting of 200 shares of non-par-value stock. Included in the assets so transferred were service fees uncollected in the amount of $209,748.20, which represented fees due from commercial sponsors for calls previously made by the hostesses. These service fees, when collected by the Corporation, were included in and reported in its income for the years when collected. Respondent determined that the service fees, when collected, were includible in the income of Briggs for the years 1946 and 1947, and, in his notice of deficiency in Docket No. 36512, stated: "It is held that the income realized from the collection *229 of certain accounts receivable is taxable to you under the provisions of Sections 22(a) and 41 of the Internal Revenue Code. Since such income was not included in your returns, your income has been increased in the years 1946 and 1947 by the amounts of $87,082.76 and $5,360.10, respectively." Issue 4. Facts Found: On its corporation income tax returns for the fiscal years ended June 30, 1947, to June 30, 1950, inclusive, Welcome Wagon deducted as expenses of operating a houseboat or yacht called the Coronet the following amounts: June 30, 1947
June 30, 1948
June 30, 1949
June 30, 1950
Yacht Salaries & expenses
$16,093.52
$20,952.87
$23,078.29
$14,939.19
Taxes on yacht salaries
115.23
170.59
355.91
239.96
Personalty tax on yacht
188.99
Depreciation
2,427.00
5,802.54
7,902.34
8,145.66
Total
$18,635.75
$26,926.00
$31,525.53
$23,324.81 All of which amounts were disallowed by the Commissioner in his notices of deficiency, on the ground that they "do not constitute ordinary and necessary business expenses of the corporation." The Coronet, bought in 1946 for $35,000, was owned and operated by Welcome Wagon *230 in the taxable years, is 78 feet long and 17 feet wide, and has a dining room, reception room, 2 double staterooms, 2 single staterooms, crew's quarters and a large afterdeck, and requires a crew of 5. Its home port is St. Augustine, Florida. It is in operation eight months of each year and moves from Maine to the Gulf of Mexico, stopping at intermediate ports, and is in Florida principally during the winter and in New York and New England during the summer. The Coronet was sometimes used by Welcome Wagon for holding business meetings and was frequently used for entertaining Welcome Wagon personnel - hostesses and supervisors, and sponsors, prospective sponsors, prospective hostesses, members of the press, radio and television, and Chamber of Commerce and civic officials in various cities. Briggs had owned a yacht since 1930, which was traded in 1946 as part payment for the Coronet. While operating as sole proprietor he had used this prior-owned yacht in the Welcome Wagon business. He has been a member of the Memphis Yacht Club and other yacht clubs for many years. Fifty per cent of the amounts here claimed by Welcome Wagon as expenditures for entertainment and for Coronet's *231 expenses were ordinary and necessary expenses of Welcome Wagon's trade or business during the years in controversy, and 50 per cent were personal expenses of Briggs. Issue 5. Facts Found: The Commissioner disallowed deductions claimed by Welcome Wagon as travel, road and general expenses in the amounts of $5,354.69, $11,803.18, $14,869.33 and $18,973.70 for the respective fiscal years ended June 30, 1947, to June 30, 1950, inclusive, on the ground that they were personal expenses of Briggs paid by Welcome Wagon. The hundreds of items comprising these disallowed expenses and the amount and date of each are contained in Exhibits 43 to 52, inclusive. They include hotel bills, airline tickets, food, liquors, entertainment, garage bills, etc. A large part of same was for the rent and maintenance of a New York apartment leased by Welcome Wagon throughout each of the taxable years. Briggs and wife occupied it while in New York. Briggs' work for Welcome Wagon required him to do considerable traveling over the United States. While not traveling, he spent about half of his time in New York and the other half in Memphis. Mrs. Briggs usually accompanied him and acted as his secretary, and was *232 helpful in contacting the thousands of hostesses throughout the country. The New York apartment was used frequently for entertaining the training classes of Welcome Wagon and other guests of the Company. Mrs. Briggs served as hostess in preparing for and entertaining guests. The business of Welcome Wagon is benefited by entertainment and social contacts. One item disallowed was $4,060.66, European trip by Briggs in 1949 for Welcome Wagon, authorized by its board of directors, for the purpose of making an investigation of the advisability of the Company inaugurating its service in Europe. Briggs visited 13 countries, called upon ambassadors, lawyers and other prominent citizens, and as result of his survey made a favorable report. Mrs. Briggs accompanied him, acted as his secretary, handled all appointments, exchange of money, mail, correspondence and kept notes, and made a report of the trip and kept a record of the out-of-pocket expenses. Respondent erroneously twice disallowed this expense item of $4,060.66. Fifty per cent of the deductions for expenses disallowed by the Commissioner under Issue 5 were ordinary and necessary business expenses of Welcome Wagon and the remaining *233 50 per cent were personal expenses of Briggs. Issue 6. Facts Found: The Commissioner, in his notice of deficiency in Docket No. 48934, determined that Briggs and Kathleen received taxable dividends during their taxable years ended December 31, 1948, and December 31, 1949, in the respective amounts of $47,843.87 and $49,626.03 by virtue of Welcome Wagon having paid personal expenses of Briggs. The above figures relate to expense items disallowed by the Commissioner under Issues 4 and 5, and under Rule 50 computation should be checked for accuracy. Fifty per cent of the amounts actually claimed as deductible business expenses and disallowed by the Commissioner were ordinary and necessary business expenses of Welcome Wagon and the remaining 50 per cent were personal expenses of Briggs and constituted income to Briggs and Kathleen, upon which they have not paid income tax. Issue 7. Facts Found: In Docket No. 48934 the Commissioner disallowed Briggs' and Kathleen's claimed business expense deductions in the amounts of $4,144.49 and $3,307.94 for the respective years 1948 and 1949. These expenses were incurred by Briggs as a sole proprietor in connection with the operation of his business *234 in Canada, he not having transferred to the Corporation the Canadian business. The Canadian business was handled out of the New York office. The disallowed expenses were for entertainment and lodging at the Seigniary Club in Canada, for rental of an automobile in Canada for Briggs to visit cities where he had business, for the pro rata share of decorating the New York apartment and for depreciation on furniture and fixtures in the New York apartment. Fifty per cent of the expenses disallowed by the Commissioner under Issue 7 were ordinary and necessary business expenses of Briggs and the remaining 50 per cent were his personal expenses. Issue 8. Facts Found: Respondent in his deficiency notice disallowed in part deduction claimed by Briggs in 1947 for medical expenses, the disallowance being for that amount not in excess of 5 per cent of the adjusted gross income, as prescribed in section 23(x), I.R.C. of 1939. The parties are agreed that whether Briggs is entitled to deduct a larger sum for medical expenses than that allowed by respondent will be determined by the adjusted gross income for 1947 as revealed by the Rule 50 computation under this decision. Issue 9. Facts Found: *235 In 1942 Kathleen inherited an undivided interest in a tract of land near Memphis, Tennessee, and early in 1947 it was partitioned and she was allotted 27 acres. The partition resulted from the advice of Faxon, a real estate broker who wanted to subdivide the property and sell it for her. Faxon's firm specialized in subdividing real estate. Kathleen entered into a written agreement with Faxon's firm, on April 1, 1947, whereby the brokers were to subdivide the property, clear and gravel the streets, submit to the authorities of the City of Memphis the proposed plan of development and have it approved, and sell the lots in the subdivision. The cost of development of the property was to be paid by Kathleen. The brokers were to receive a commission of 5 per cent plus 50 per cent of the profits. The proceeds of the sales were used (1) to first pay the 5 per cent commission due the brokers; (2) to reimburse Kathleen for cost of the improvements; (3) to pay $400 to petitioner Kathleen for each lot; and (4) the remainder to be divided equally. The terms of the contract were carried out. In 1948, 37 lots were sold from which Kathleen realized a gain of $9,206.49, and in 1949, 21 lots were *236 sold from which she realized a gain of $8,568.94. All sales were made by the brokers unassisted by Kathleen. The deeds to the lots sold were generally executed by Kathleen's sister under power of attorney, since Kathleen was frequently absent from Memphis. Kathleen did not have a real estate license. The Commissioner disallowed Kathleen's claim that the gains from the sale of the lots were capital gains and held them to be ordinary income. Opinion Issue 1: Was the corporation Welcome Wagon formed or availed of to prevent the imposition of a surtax upon its sole stockholder, as defined in section 102 of the Internal Revenue Code of 1939? Section 102(c) of the Code provides that if the earnings or profits of a corporation "are permitted to accumulate beyond the reasonable needs of the business [that] shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary." The concrete question thus presented is whether the Corporation in the taxable years permitted its earnings or profits *237 to accumulate beyond the reasonable needs of the business. The answer to that question is purely factual. Each case must be determined from its own peculiar facts and circumstances, including the nature of the business, the method of its operation, the capital required, plans for (a) expansion of the business, (b) acquisition of property for use in its business, etc. The accumulation of earnings and profits in a large amount does not necessarily mean the accumulation is beyond the reasonable needs of the business. What the needs of the business are and the purpose for which the accumulation was made, rather than the amount of it, is the vital question. In Crawford County Printing & Publishing Co., 17 T.C. at page 1414, it was said: "* * * What is reasonable in one situation may be unreasonable in a different context of facts. We should be hesitant to attribute a sinister or ulterior motive to the corporation unless such a factual situation clearly appears. The law contemplates that any legitimate business may grow if legitimate means be employed. There are various and sundry *238 ways, all natively legitimate, by which a business may acquire the means of growth and finance its proper expansion. It can issue capital stock or other securities. It may resort to bank loans. Yet again, it may plow its earnings back into the business for immediate uses. * * *" Unlike a normal and ordinary type of business, Welcome Wagon could not "resort to bank loans." It unsuccessfully sought to obtain an open line of credit with banks both in Memphis and New York during the taxable years. Its inability to obtain bank credit required it to keep larger cash reserves to meet its current obligations which, as detailed in our findings of fact, plus taxes due, were quite large. Aside from its current obligations in the taxable years, Welcome Wagon was planning for an expansion of its business. It had sent representatives to Europe to investigate the feasibility of establishing the business in several European countries. During the taxable years and prior thereto, Welcome Wagon had also been in need of buildings in which to carry on its business, and negotiations had begun for the acquisition of properties, both in Memphis and New York, and also Los Angeles, which culminated in the *239 purchase, in 1949, of the Memphis building for $225,000, and in May, 1951, of a building in New York for $1,475,000. Considering all the facts and circumstances as detailed in our findings of fact, which we deem unnecessary to repeat, we think Welcome Wagon has met its burden of proof and has shown that it did not permit to accumulate earnings or profits beyond the reasonable needs of its business. We are not impressed with respondent's contention that Welcome Wagon was "formed" or incorporated to prevent the imposition of a surtax upon Briggs, its sole stockholder. He argues that since Briggs had operated the business for 18 years as its sole proprietor, his decision to incorporate it after the business had expanded and the tax liability had increased indicates that it was for tax purposes that the corporation was formed. We can not agree with this conclusion. Briggs' attorney had for several years urged incorporation of the business, one of the reasons being to insure its continuity. It may be that as Briggs grew older this suggestion had more weight with him. The strange thing to us is not that the business was incorporated, but that it was not incorporated years before. It *240 had grown from a local to a national business, was operating in nearly every state in the Union, and evidently it was not feasible to continue its operation as a sole proprietorship. Sound business judgment as well as legal consequences demanded that a business of this kind should be incorporated. Issue 2: The evidence refutes the Commissioner's determination that any of the taxpayers here for the years in question were on the accrual basis of accounting and hence should have reported their income on that basis. The evidence shows that the taxpayers herein have at all times consistently kept their books and records predominately on a cash basis of accounting, and used that method in reporting their income, and same has not heretofore been questioned by the respondent. The respondent manifested inconsistency and uncertainty as to this issue. His revenue agent's report held that the taxpayers were on a cash basis, while the deficiency notices thereafter issued determined they were on the accrual basis, and yet respondent's answer to Welcome Wagon's petition, in Docket No. 43484, admits that the taxpayer was "on a cash basis, and the fact was so stated in the examining officer's *241 report." This pleading repudiated the deficiency notice and approved the examining officer's report. That respondent, in an amended answer filed nine months later, conformed his plea on this issue to the deficiency notice accentuates rather than diminishes his vacillation and uncertainty. It is significant also that Rubenstein, "the examining officer," above referred to, was present at the hearing of these proceedings as a witness for respondent and was not called upon to testify. Also present at the hearing and unused was respondent's witness, Revenue Agent Reed, who likewise had made an examination of the books and records of the taxpayers herein. No reason was given why these two witnesses, who evidently could have shed light upon the accounting issue, were not called to testify. Under the circumstances, the failure of respondent to call these two witnesses to testify creates a presumption that if they had been called, their testimony would have been unfavorable or adverse to respondent. This is especially true as to Rubenstein who had filed a written report in which he found that the taxpayers herein kept their books and records on a cash basis. Wichita Terminal Elevator Co., 6 T.C. 1158, *242 affd. 162 Fed. (2d) 513; Bernard Stoumen v. Commissioner, 208 Fed. (2d) 903, affirming Memorandum Opinion of the Tax Court [12 TCM 267;]. No witness testified that the petitioners used the accrual method of accounting. Hunt, a former internal revenue agent, respondent's only witness on this issue, testified that as result of his examination of the books of Welcome Wagon, in his opinion they "were kept on a hybrid basis which was predominantly accrual." However, on cross examination, he admitted that the only expense items on an accrual basis were payroll taxes, and that these items were not substantial. He also said that his examination of the records were in part based upon the "Collateral report" of Revenue Agent Reed. Aside from other evidence the petitioners' contention was supported by the testimony of two witnesses, both of whom were well qualified to testify as experts, one of whom has been a certified public accountant since 1928 and partner in an accounting firm since 1938, and the other a certified public accountant for thirty years and senior partner for fifteen years in a large accounting firm in New York. Both of them testified *243 that based upon their own examination of the books and records of the petitioners and income tax returns filed herein, in their opinion the books and records were kept on a cash rather than an accrual basis of accounting; that the books and records as kept correctly reflected their income, and that due to the nature of the business of Welcome Wagon it would have been impractical to have used the accrual method. Their testimony was clear and convincing. In Diamond A Cattle Co., 21 T.C. at page 4, we said: "The petitioner, to support its contention that it has never used an accrual method, should show that its method is not an accrual method, or, at least, that in the majority of the most substantial items of income and deductions it is not an accrual method. [Citing authorities]" Petitioners here have met this test by showing that the accrual method was not used, or, in any event, "the most substantial items of income and deductions" were not on the accrual basis. The only items accrued were the payroll taxes which even respondent's witness admits were not substantial. Petitioners are sustained on this issue. In Docket No. 36512 herein an additional reason exists *244 for overruling respondent's contention on the accounting issue, in that the deficiency notice issued therein was silent as to this issue and same was first raised by respondent in his amended answer. This placed the burden of proof on respondent, which he has failed to sustain. Sheldon Tauber, 24 T.C. 179. Issue 3: Respondent on brief seeks to sustain his determination that the income from the uncollected service fees transferred with other assets to the newly formed corporation by Briggs was taxable to Briggs rather than to the Corporation on the ground that Briggs should have reported his income on the accrual basis of accounting for the years 1946 and 1947. We have held adversely to respondent on this issue. He then argues that if it be held that Briggs was on the cash basis of accounting, that since the sole proprietorship was a service organization at the time the accounts were assigned to the Corporation, all services required had been performed and that the facts bring the question within the rationale of H. Lewis Brown, 40 B.T.A. 565. We do not agree. The facts there are different from those here and the holding is not applicable. Neither do *245 we think section 41 of the Internal Revenue Code and Jud Plumbing & Heating, Inc., 5 T.C. 127 and Standard Paving Co., 13 T.C. 425, cited by respondent, are pertinent. These cases involve the dissolution of corporations reporting income on a completed contract basis, and a special method of accounting was required for contractors. Finally, respondent cites section 45 of the Code, which provides that where two or more businesses are controlled by the same interests, the Commissioner is authorized to distribute, apportion or allocate gross income among such organizations "if he determines that such distribution, apportionment or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations * * *." This section is not mentioned in the deficiency notice or the pleadings, and is raised for the first time in respondent's brief. The evidence here affirmatively shows no evasion or attempted evasion of the taxes in question, but the same were all paid in full by the Corporation, as the collections were made by it. Respondent is not sustained on this issue. Issue 4: On this issue the *246 parties have stipulated that the amounts claimed and disallowed as "boat expenses" were paid, and the only question remaining is whether or not same constitute ordinary and necessary business expenses. Considerable evidence was introduced on this issue, all of which we have carefully considered but which we deem unnecessary to recite, and based thereon we have found as an ultimate fact that 50 per cent of such expenditures did constitute reasonable and necessary business expenses of Welcome Wagon. Respondent, on brief, after arguing that these expenditures did not constitute ordinary and necessary business expenses, concludes by citing Richard A. Sutter, 21 T.C. 170, and then "* * * suggests that in the event the Court should consider that some of the yacht expenses involved here are ordinary and necessary business expenses, a fair application of the rule in Cohan v. Commissioner, 39 Fed. (2d) 540, would be to determine that not more than 25 per cent of such expenses were ordinary and necessary business expenses." We have given this suggestion consideration, but we are unable to act favorably thereon. The facts here are evidently more favorable to *247 the taxpayer than in the Sutter case, where 25 per cent of the amount claimed was allowed. In determining the 50 per cent allocation we have applied the Cohan rule, as was done in the Sutter case. There, as here, "the total amount of the expenses is not conjectural," having been stipulated, but we "* * * regard an allocation as required because it is evident that only a part of these conceded expenditures may be characterized as the ordinary and necessary consequences of petitioner's trade or business." To some extent they were personal expenses of Briggs, while in some degree they were a means of enhancing Welcome Wagon's prestige and the future possibility of expanding its business so as to be the means of creating a capital asset comparable to good will. We think a fair and reasonable interpretation of all the evidence clearly reveals that at least one-half of the claimed expenditures for the maintenance and operation of the Coronet should be allocated as reasonable and necessary business expenses of Welcome Wagon, and deduction to that extent is approved. Issue 5: As in Issue 4, respondent in effect concedes that a part of the expenses here involved were deductible, and *248 suggests that a fair application of the Cohan rule "would be to determine that not more than 25 per cent of the apartment expenses were ordinary and necessary business expenses." We can not accept this suggestion. Under the evidence and the record as a whole we have found that 50 per cent of the expenses in question were reasonable and necessary business expenses of Welcome Wagon and the remaining 50 per cent were personal expenses of Briggs. Issue 6: Respondent contends that all expenses of Welcome Wagon disallowed on the ground that they were personal expenses of Briggs constitute dividends to him from the Corporation, of which he was the sole stockholder. We agree. It follows, of course, that all such expenditures were income of and taxable to Briggs. See Lucien L. Yeomans, 5 T.C. 870; Regensburger [Regensburg] v. Commissioner, 144 Fed. (2d) 41, affirming Tax Court Memorandum Opinion [1 TCM 925;], certiorari denied 323 U.S. 783. In our findings of fact we have reduced the amounts under this issue which the Commissioner determined were personal expenses of Briggs, and to that extent the respondent is sustained. Issue *249 7: The expenses here in question were substantially of the same nature and character as those in Issue 5, the chief difference being that there the expenses were incurred on behalf of the Corporation, while here they were incurred on behalf of Briggs operating as a sole proprietor in his Canadian business. There, as here, we have applied the Cohan rule to the evidence, and have determined therefrom that 50 per cent of the expenses disallowed under Issue 7 were ordinary and necessary business expenses of Briggs and therefore deductible, and the remaining one-half were personal expenses and hence are not deductible. Issue 9: Were the lots sold by Kathleen in 1948 and 1949 "property held by the taxpayer primarily for sale to customers in the ordinary course of his [her] trade or business" within the meaning of section 117(a)(1)(A), Internal Revenue Code of 1939? If so, the gain from the sale of the lots constituted ordinary income taxable under section 22(a) and not a capital gain taxable under section 117(a)(1). The evidence here reveals that Kathleen in 1948 and 1949 was in the business of selling real estate. She was not personally making the sales; that was being done by the *250 brokers who were not only her agents, but under her contract with them they were all partners or joint venturers in the business of selling lots. She was furnishing the land and bearing all expenses of improving and subdividing same, was paying the brokers a 5 per cent commission, and thereafter sharing equally with them the profits from the sales. Evidently she was a participant in a going business, and, from the gains admittedly received by her in the taxable years, it was a prosperous one. Petitioners argue that Kathleen was not engaged in business, but was merely liquidating the property which she had inherited. We do not agree. Where liquidation of an asset is accompanied by extensive development and sales activity, the mere fact of liquidation does not preclude the existence of a trade or business. White v. Commissioner, 172 Fed. (2d) 629, affirming Tax Court Memorandum Opinion [6 TCM 1038;]. See also Mauldin v. Commissioner, 195 Fed. (2d) 714, affirming C. E. Mauldin, 16 T.C. 698; Richards v. Commissioner, 81 Fed. (2d) 369, *251 affirming 30 B.T.A. 1131. In construing the meaning, as here used, of the term "ordinary trade or business," it has been held to apply to a taxpayer who operates the business through an agent, and also the business in question need not be the taxpayer's sole occupation. Snell v. Commissioner, 97 Fed. (2d) 891. W. T. Thrift, Sr., 15 T.C. 366, cited by petitioners is distinguishable. There the taxpayer made no effort to sell the property to the general public, but was interested only in selling same to certain individuals with whom he had an original agreement to sell when the property was acquired. In the absence of proof to the contrary, we may assume in the instant case that the sales here were made to the general public and there were no restrictions as to the purchasers. Respondent is sustained as to Issue 9. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Welcome Wagon, Inc., Docket No. 43484; Welcome Wagon, Inc., Docket No. 45178; Thomas W. Briggs and Kathleen Briggs, Husband and Wife, Docket No. 48934.↩
*. Respondent by amended answer increased this amount by $4,055.19 to $8,684.39.↩
*. Adjusted Gross Income.↩
*. Adjusted Gross Income.↩
2. Other facts relating to this and the other issues may be found in our General Findings of Fact.↩